799 F.2d 726
 15 Collier Bankr.Cas.2d 726, 15 Bankr.Ct.Dec. 254
 In re N & D PROPERTIES, INC., Debtor.
Julia Schou ESTES, Plaintiff-Appellee,
v.
N & D PROPERTIES, INC., Sofa Galleries on Paces, Defendants,
David W. Cranshaw, Trustee for N & D Properties, Inc., Appellant.
 No. 85-8890.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 19, 1986.
 
 Robert A. Bartlett, Steven K. Bender, Peter J. Quist, Atlanta, Ga., for appellant.
 Nolan B. Harmon, Karsten Bicknese, Tyrone M. Bridges, Atlanta, Ga., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before RONEY, Chief Judge, CLARK, Circuit Judge, and GIBSON*, Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 Appellant David Cranshaw, bankruptcy trustee for debtor N & D Properties, Inc. brings this appeal from the district court's denial of subordination or invalidation of appellee Julia Estes' secured claims against the estate of the debtor. Mrs. Estes, a minority shareholder of the debtor corporation, had filed a claim against the estate for loans to the debtor in the amount of $320,000. The bankruptcy court found verifiable loans in the amount of only $192,858 and deemed $60,000 of that sum to be a capital contribution. The remaining $132,858 was then subordinated to unsecured creditor's claims on grounds of appellee's unequitable conduct toward the debtor. The bankruptcy court refused to invalidate the claim as a fraudulent conveyance or a disguised capital contribution. Appellee sought review of the order to subordinate her claims in the district court. The district court overturned the bankruptcy court's conclusions regarding inequitable conduct and let the adjusted claim of $132,858 stand as a secured claim prior to those of unsecured creditors. Denial of invalidation on alternative grounds was affirmed. The trustee now appeals from the district court order, alleging error in the denial of subordination and invalidation. We reverse in part and affirm in part.
 
 I. FACTS
 
 2
 Appellee Julia Estes is a Marietta, Georgia housewife. Some years ago, she inherited several hundred thousand dollars. In February, 1980, her accountant and tax advisor, James Dowis, asked her to help him start a retail furniture business under the name N & D Properties, Inc. Estes lent N & D $40,000, with interest to be paid as a percentage of sales, and principal to be repaid "when the store got on its feet."[1] Eight months later, appellee pledged bonds worth $100,000 to enable N & D, the debtor, to borrow money from First National Bank of Gwinnett ("FNBG"). In return, Estes received 450 shares, or 47.4 percent, of N & D. N & D then loaned appellee $25,000 of the bank loan proceeds. Appellee used the money to construct a swimming pool at her home, and repaid the loan a year later. In April, 1981, appellee pledged on behalf of N & D some American Brands Corporation stock to First National Bank of Cobb ("FNBC"). FNBC secured its loans to N & D not only with appellee's stock collateral, but also with a security interest in the debtor's inventory.
 
 
 3
 Over the course of the next two years, the debtor borrowed approximately $389,588 against appellee's stock collateral.[2] Appellee was personally obligated on most of the debtor's borrowings from FNBC. In addition to pledging valuable assets in support of bank loans, appellee from time to time also made numerous small loans to the debtor.
 
 
 4
 From the debtor's inception, business affairs were directed by James Dowis rather than appellee. Dowis was the majority shareholder and president, as well as the bookkeeper and part-time store manager. Dowis' management of the debtor's affairs was inept. He failed to keep adequate records of sales and expenses, failed to maintain a trust account for consumer deposits, engaged in check kiting and used misleading and inaccurate financial statements to obtain financing from banks and trade creditors. Dowis also withdrew approximately $273,000 from the debtor for personal expenses, including the purchase of equipment for his soybean farm called "Teaselwood Farms."[3]
 
 
 5
 Although appellee left management to Dowis and visited the debtor's store on only two or three occasions, she had several opportunities to learn of the debtor's financial problems. For example, appellee occasionally received the debtor's financial statements. Close inspection of these would have revealed that appellee's pledged collateral was erroneously listed as an asset of the corporation. This misrepresentation inflated the debtor's assets and thereby obscured the debtor's weak financial position. Appellee also could have learned about the debtor's problems by examining her own personal tax returns. During the years in which the debtor operated, Dowis prepared appellee's tax returns and included substantial tax deductions[4] based on the debtor's repeated losses. Although appellee signed the returns, she never questioned why the debtor continued to lose money nor did she connect the losses with the debtor's constant need for additional loans. The bankruptcy court attributed appellee's failure to discover the debtor's problems to appellee's lack of business education, experience and judgment.
 
 
 6
 Appellee was eventually alerted to the debtor's true financial condition in April 1983, when she learned that FNBC was considering calling its loan of $189,588. Appellee then met with Dowis and the debtor's staff to determine whether appellee should put more money into the business. One month later, the debtor's fortunes slipped again as its principal supplier stopped further shipment of furniture.
 
 
 7
 On June 23, FNBC called its loans and appellee retained a business consultant to investigate the debtor's situation in detail. Appellee's consultant learned about Dowis' mismanagement, including his failure to keep adequate records and to create a trust account for customer deposits. Despite this knowledge, appellee took no steps to close the store. The debtor continued to advertise and sell furniture, offering substantial discounts to customers who paid 50 to 100 percent of the purchase price in advance. The debtor promised delivery in six to eight weeks, even though its suppliers still refused to make further shipments. On July 18, appellee's consultant recommended that appellee make no further investment in the debtor. Appellee liquidated her stock collateral to pay FNBC and took an assignment of FNBC's security interest in the debtor's inventory.
 
 
 8
 Sometime thereafter, appellee decided that the debtor should file for protection under the bankruptcy laws. On July 22, appellee loaned the debtor $1,200 for filing fees and expenses, taking a second security interest in the debtor's remaining assets. On July 29, appellee became an officer of the debtor in order to file a valid bankruptcy petition. Three days later, the debtor filed for bankruptcy and appellee immediately resigned as secretary. On August 25, appellee filed her claim against the debtor's estate.
 
 II. OPINIONS OF THE COURTS BELOW
 
 9
 As already noted, the bankruptcy court greatly reduced appellee's verified claim and then subordinated it to other claims against the estate. The court relied upon the fact that appellee had taken an assignment of FNBC's security interest on July 29, 1983, when she had full knowledge that appellee was insolvent. The court found this particularly egregious because appellee was already personally obligated to pay the debtor's loan from FNBC; she was not a disinterested volunteer. The assignment was obviously detrimental to other creditors, for it encumbered what few assets were available to the estate. For these reasons, the court also subordinated appellee's claim based on the $1,200 secured loan made to the debtor on the eve of bankruptcy.
 
 
 10
 The bankruptcy court refused to find, however, that all of appellee's loans and pledges on behalf of debtor should be considered capital contributions. It found no agreement to this effect between appellee and the majority shareholder, Dowis. The court likewise refused to find capital contributions based on the "Deep Rock"[5] or thin capitalization theory. In its opinion, the evidence justified only equitable subordination. The court also found no fraudulent conveyances or preferential transfers from debtor to appellee because the property allegedly conveyed had never been property of the debtor.
 
 
 11
 Later, the bankruptcy court clarified and amplified these legal conclusions in a second opinion. The court justified equitable subordination of appellee's first security interest from FNBC on several grounds in addition to appellee's pre-existing liability. First, appellee took a security interest, something she had never before done, only when the debtor was on the brink of collapse. Second, appellee's new secured position gave other creditors no notice that both the bank and a substantial shareholder were first in line. Third, appellee had displayed bad business judgment and unjustifiable ignorance about the debtor's poor prospects even though she had known for two years that debtor had initially defaulted on its principal loan. Fourth, appellee had failed to meet her burden of proof as to the good faith and fairness of her transactions with the debtor since the time she knew of its insolvency.
 
 
 12
 The district court adopted the bankruptcy court's findings of fact but disagreed with the legal conclusions in both opinions. The court reversed the equitable subordination because appellee was acting as a surety in paying off the debtor's loan. It is commonplace for a surety to assume the creditor's secured position by assignment. Furthermore, no notice problem resulted because appellee had no secret lien. She was merely standing in the shoes of FNBC of whom all creditors were aware. The district court then affirmed the decision not to consider all loans to be capital contributions. Any contrary finding would require more than the mere fact of the debtor's insolvency, it also would require evidence of unfair dealing between the debtor and the lender-shareholder. The district court found none, nor did it find any preferential or fraudulent transfers. The district court concluded that at the time of the challenged transactions, appellee was simply a passive minority shareholder who knew something of the debtor's past defaults and tax losses, but lacked the sophistication to interpret these as signs of insolvency. Consequently her claims were restored to priority.
 
 III. DISCUSSION OF ISSUES ON APPEAL
 
 13
 The trustee here contends that appellee was anything but a passive victim of the majority shareholder's mismanagement. He argues that appellee and her co-shareholder devised a scheme whereby they would operate the debtor without any true capitalization, obtaining the benefits of ownership, including cash disbursements and tax losses, but not incurring any of the risks of capital investment. The trustee points to almost all of appellee's contacts with the debtor as evidence of inequitable conduct requiring subordination. Furthermore he contends that the debtor's lack of proper capitalization requires disallowance of any claim against the estate since the numerous loans should be considered capital investment. Lastly, the trustee seeks a finding of appellee's personal liability for certain payments received from the debtor. While we do not adopt the trustee's characterization of events in detail, we do agree that the district court erred in overturning the decision to equitably subordinate appellee's claim. We decline, however, to invalidate the claim as a capital contribution or to find personal liability.
 
 A. Equitable Subordination
 
 14
 Section 510(c) of the Bankruptcy Code provides that claims against the debtor's estate may be accorded a priority inferior to those of secured or unsecured creditors where "the principles of equitable subordination" so dictate. This section's legislative history indicates that such principles are to be found in case law on the subject. See S.Rep. No. 989, 95th Cong., 2nd Sess. 74 (1978); U.S.Code Cong. & Admin.News 1978, pp. 5787, 5860. Binding precedent in this circuit holds that equitable subordination is proper where three elements are established:
 
 
 15
 (1) that the claimant has engaged in inequitable conduct;
 
 
 16
 (2) that the conduct has injured creditors or given unfair advantage to the claimant; and
 
 
 17
 (3) that subordination of the claim is not inconsistent with the Bankruptcy Code.
 
 
 18
 See In re Mobile Steel, 563 F.2d 692 (5th Cir.1977).
 
 
 19
 The burden and sufficiency of proof required are not uniform in all cases. Where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. See In re Multiponics, 622 F.2d 709, 714 (5th Cir.1980). Once the trustee meets his burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated. See id. If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoilation or overreaching, and prove it with particularity. See In re Ludwig Honold Mfg. Co., 46 B.R. 125 (Bkrtcy.E.D.Pa.1985) (citing In re W.T. Grant, 699 F.2d 599 (2d Cir.1983) ).
 
 
 20
 In light of these distinctions, the trustee's claim of error on equitable subordination cannot be properly evaluated until the appropriate standard and burden of proof are determined. The correct standard, of course, depends upon if and when appellee became an insider or fiduciary of the debtor. The Bankruptcy Code defines an insider as an officer, director, or "person in control of the debtor" corporation. See Sec. 101(28)(B). A fiduciary, under general corporate theory, includes an officer, director, agent, majority shareholder or a minority shareholder exercising actual control over the corporation. See 12B Fletcher, Cyclopedia Corporations Sec. 5811 at 156-57 (1984). A shareholder has control when she determines corporate policy, whether by personally assuming management responsibility or by selecting management personnel. See Berle, "Control" in Corporate Law, 58 Colum.L.Rev. 1212 (1958).
 
 
 21
 In this case, appellee clearly was an insider and fiduciary as of July 29, 1983, when she became secretary of the debtor. According to the bankruptcy court's findings, however, appellee actually became an insider well before this date because she controlled the debtor throughout the month of July, 1983. Indeed, the record indicates that appellee took control of the debtor shortly after FNBC called its loans on June 23. For example, appellee immediately retained legal counsel to evaluate the debtor's options and to negotiate an extension of the debtor's loans. A business consultant was also hired to review the debtor's operations. The consultant made initial recommendations with respect to changes needed in management personnel, pricing policy, cost control and capital investment. As appellee's agent, the consultant also attempted to negotiate a new lease for the debtor and new supply agreements with trade creditors. He even sought to arrange additional security to protect debtor's premises from irate consumer creditors. Although appellee never made any of the recommended changes in the debtor's operations, that was not because the majority shareholder thwarted her efforts. Rather, appellee was ultimately advised to abandon the debtor to bankruptcy proceedings, and she followed that advice without consulting the majority shareholder.
 
 
 22
 Thus, appellee was a controlling shareholder and insider at least from July 1, 1983. She owed a fiduciary duty toward the debtor and its creditors from that date forward, and she bears the burden of proving the fairness of her actions while in control. We find that appellee has not met her burden and therefore the district court erred in not subordinating her claim. Appellee's behavior while in control indicates that she was acting solely for her own benefit, to minimize her risk of loss without any consideration for other creditors. Such pursuit of personal gain at the expense of other creditors has been recognized as a breach of fiduciary duty justifying equitable subordination. See In re American Lumber Co., 7 B.R. 519 (Bkrtcy.D.Minn.1979); see also In re W.T. Grant Co., supra at 610-11.
 
 
 23
 In this case, the unfairness of appellee's actions is best demonstrated by a comparison of the steps appellee took on behalf of creditors and the steps she took on her own behalf. At the time appellee took control, she knew that the debtor's suppliers had cut off further shipments and that the debtor was still soliciting business with large advertised discounts. Shortly thereafter, appellee also learned, through her agent, that the debtor was taking cash deposits up to 100 percent without maintaining a trust account. Customers were also being deceived as to the time of delivery and the reason for delay. Despite this knowledge, appellee took no steps to stop advertising, to segregate deposits, to reduce the percentage of deposits accepted or to simply close the store. Appellee instead made every effort to encumber all assets and obtain a priority in the impending bankruptcy proceedings.
 
 
 24
 In determining that appellee acted inequitably, we note that most of her actions (or rather inaction) disadvantaged only a portion of the creditors, specifically the consumer creditors.[6] Trade creditors were not harmed by appellee's tolerance of shoddy business practices or by her effort to obtain FNBC's security interest by subrogation and assignment. The latter creditors could easily have learned that appellee was the debtor's surety and therefore entitled under state law to assume FNBC's secured position.[7] Since equitable subordination operates only to redress the amount of actual harm done, see In re Westgate-California Corp., 642 F.2d 1174, 1176 (9th Cir.1981), the portion of appellee's claim based upon FNBC's secured status is subordinated only to the claims of consumer creditors.[8] Appellee's second secured claim of $1,200 should, however, be subordinated to the claims of both consumer and trade creditors. Appellee obtained this second secured claim on the eve of bankruptcy, when she not only knew of Dowis' misrepresentations to the trade creditors but also knew that the debtor was insolvent and about to file a petition. Clearly, this was a breach of fiduciary duty toward all creditors and the claim must be fully subordinated.
 
 
 25
 B. Invalidation of Claims for the Capitalization
 
 
 26
 In addition to equitable subordination, the trustee seeks complete invalidation of appellee's claims against the debtor. The trustee argues that all of appellee's loans to the debtor should be deemed capital contributions because appellee and her fellow-shareholder engaged in "a scheme and device" to avoid the risks of business ownership. According to the trustee, appellee repeatedly made loans to the debtor to avoid properly capitalizing the business with her inheritance.
 
 
 27
 Shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial under-capitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit. See In re Multiponics, Inc., 622 F.2d 709 (5th Cir.1980). The trustee has proven neither circumstance in this case. The bankruptcy court never found that the debtor was under-capitalized at the outset. In fact, the trustee's expert testified that capitalization was adequate for the limited scope of the debtor's business at that time.[9] Furthermore, the trustee never showed that at the time of appellee's subsequent loans the debtor was ineligible for loans from unaffiliated lenders. Without proof of either set of facts, invalidation of appellee's claim would be improper.
 
 
 28
 C. Personal Liability for Fraudulent Conveyances and Preferential Transfers
 
 
 29
 As a final matter, the trustee seeks return of $117,972 allegedly received by appellee from the debtor. The trustee claims that these disbursements were either fraudulent or preferential since appellee gave no consideration for the payments, and they occurred while the debtor was insolvent. The largest amount in question is $79,692, received by appellee when she liquidated her pledged collateral to pay off the debtor's loans from FNBC. The value of appellee's pledged stock had exceeded the debtor's loans by this amount. The remaining sums include all payments received over the years as interest on appellee's loans to the debtor, and all money transferred from the debtor to Teaselwood Farms.
 
 
 30
 Despite the trustee's vigorous argument, the transfer of $79,692 to appellee was not in any way improper. Fraudulent and preferential transfers may be avoided only where property of the debtor is transferred. See 11 U.S.C. Sec. 547(b), 548. As both lower courts have explained, the collateral pledged by appellee was never conveyed to the debtor. It remained appellee's property while pledged on behalf of the debtor. See In re Price Chopper Super Markets, Inc., 40 B.R. 816 (Bkrtcy.N.D.Cal.1984). In light of this fact, any funds left after liquidation of appellee's stock and payment of the loans should have been returned to appellee rather than the debtor.
 
 
 31
 The trustee's claim for some $22,000 paid as interest is likewise unsupported by the facts. The trustee argues from the premise that since all of appellee's loans were in fact capital contributions, the "interest" payments were actually improper capital withdrawals. We have already refused to accept the trustee's premise, therefore we cannot order return of bona fide interest payments.
 
 
 32
 Finally, we cannot impose liability on appellee for the transfer of $16,280 from the debtor to Teaselwood Farms. Contrary to the trustee's assertions, appellee did not consider herself the owner of this soybean farm. She believed that her co-shareholder and tax accountant, James Dowis, was the owner and operator of the farm. Indeed, the bankruptcy court refused to find that Dowis was acting as appellee's agent in connection with the farm. Therefore, appellee cannot be held responsible for Dowis' transfer of funds from the debtor to his own farm operation.[10]
 
 
 33
 In summary, we find that appellee did engage in certain inequitable conduct which prejudiced innocent creditors. Appellee's claim for $131,658 is therefore subordinated to the claims of unsecured consumer creditors. Appellee's remaining claim of $1,200 is subordinated to the claims of all unsecured creditors. No further relief is in order, however, as no preferential or fraudulent transfers occurred. The order of the district court is therefore
 
 
 34
 AFFIRMED in part and REVERSED in part.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Although the trustee claimed that any "loan" given on such terms is in fact a capital contribution, the bankruptcy court found this transfer of $40,000 to be a bona fide loan. The bankruptcy court relied on evidence of the parties' intent, as well as the fact that payments of interest were made
 
 
 [2]
 Some of these borrowings were used to repay the FNBG loan in September, 1981. Appellee's bonds were, however, later repledged for the debtor's benefit to a third bank. That loan was ultimately repaid by liquidation of the pledged collateral
 
 
 [3]
 The record on appeal is limited to this proceeding in the court below. We assume the trustee has diligently pursued the implied suggestion that Dowis used corporate assets for his personal use. The evidence is insufficient for us to draw any conclusion, except that if such withdrawals occurred, appellee was not implicated
 
 
 [4]
 For example, appellee took a deduction of $29,801 on her 1981 tax return due to the debtor's poor performance. In 1982, appellee took a deduction of $24,541. Although appellee claimed the deductions in proportion to her holdings, the deductions actually reflect 63 percent and 87.8 percent respectively of the debtor's total losses for those tax years
 
 
 [5]
 The "Deep Rock" doctrine stems from the case of Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 38 L.Ed. 669 (1939), in which the Supreme Court held that loans from a controlling shareholder to his corporation may be deemed capital contributions if the corporation was initially under-capitalized or thereafter ineligible for a loan from a disinterested source
 
 
 [6]
 Consumer creditors' claims aggregate approximately $125,000. Trade creditors' claims appear to total $30,000
 
 
 [7]
 See O.C.G.A. Sec. 10-7-56 (a surety who pays the debt of his principal shall be subrogated in law and equity to the rights of the creditor paid)
 
 
 [8]
 We note that under 11 U.S.C. Sec. 507(a)(6), the consumer creditors have a priority for amounts up to $900 per creditor over ordinary unsecured claimants
 
 
 [9]
 At the debtor's inception, its business was limited to performance of a contract for managing a retail furniture store. Since the contract imposed relatively few expenses on the debtor, its capitalization was adequate
 
 
 [10]
 The fact that appellee took certain tax deductions for purchase of farm equipment has little bearing on appellee's responsibility since she has repudiated the tax benefit by amending her returns. In any event, the truly culpable party with respect to these transfers appears to be Dowis, who attempted to dodge responsibility at trial by claiming that appellee had "tax custody" of Teaselwood Farms