In re Troy C. **MAHAN**, Debtor.

No. 3:05–bk–03762–JAF.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

July 19, 2007.

Richard R. Thames, Stutsman Thames & Markey, P.A., Jacksonville, FL, for Debtor.

Alexander G. Smith, Jacksonville, FL, pro se.

Raymond R. Magley, Smith Husley and Busey, Jacksonville, FL, for Alexander G. Smith.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This case came before the Court upon the Objection to Claim 7 filed by Alexander G. Smith (the "Trustee"). The Court conducted a hearing on the matter on January 23, 2007. In lieu of oral argument, the Court directed the parties to submit briefs in support of their respective positions. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### *Findings of Fact*

Debtor filed a Chapter 7 bankruptcy petition on April 13, 2005 (the "Petition Date"). Debtor filed bankruptcy because Donald and Cynthia Cross obtained a judgment against him on April 7, 2004 in the amount of $949,096.00. As of the Petition Date, debtor was the sole shareholder, officer and director of Southeastern Hearing, Inc. ("Southeastern"). Southeastern operates seven Miracle Ear Stores under Miracle Ear Franchise Agreements. Each store is in the business of selling, servicing, repairing and delivering hearing aids. Debtor runs the day-to-day operations of these stores.

As of the Petition Date, Southeastern was profitable. According to Southeastern's 2004 tax return, it had gross receipts of $2,216,944.00 during 2004 and a net income during 2004 of $180,382.00. (Trustee's Ex. 17). Southeastern's Statement of Assets, Liabilities and Equity as of June 30, 2005 states that the stockholders' equity in Southeastern was $148,218.00 as of that date. (Trustee's Ex. 5 at ¶ 2.)

Debtor received substantial income from Southeastern. Debtor and his wife (the "Mahans")' 2004 total income was $392,210.00. (Trustee's Ex. 16). Of that total, $279,161.00 was received from Southeastern and was comprised of Debtor's wages of $84,000.00 (Trustee's Ex. 16, Statement 6), Debtor's wife's wages of $15,000.00 (Trustee's Ex. 16, Statement 6), and corporate income of $180,161.00. (Trustee's Ex. 16, 2004 Income from Pass-throughs.)

As of the Petition Date, Southeastern was obligated to Mercantile Bank on an unsecured promissory note in the principal amount of $150,000.00 (the "Loan"). (Trustee's Ex. 2.) Debtor personally guaranteed payment of the Loan. (*Id.*) As of the Petition Date Southeastern was current on its monthly payments under the Loan.

The filing of a bankruptcy petition and the entry of a judgment against Debtor constitute defaults under the Loan documents. (Trustee's Ex. 2.) Mercantile Bank sent a letter to Debtor dated August 29, 2005 informing him that the Loan was in default and making demand upon Southeastern for payment of the sums due on the Loan. (Trustee's Ex. 3.) On August 30, 2005 in response to that letter, Debtor's attorney sent a letter to Mercantile Bank's attorney requesting that the bank enter into a forbearance agreement and offering a security interest in all of Southeastern's assets. The letter also indicated that Debtor was "negotiating a buy back of the estate's interest in Southeastern ... If we are successful in those efforts, the prospects for the bank getting paid in full is very high." (Trustee's Ex. 4.) On September 23, 2005 Mercantile Bank filed a proof of claim in Debtor's bankruptcy case based upon Debtor's guaranty of the Loan, which the Clerk's Office designated as Claim 7. (Trustee's Ex. 2.) Claim 7 asserts a contin-

gent claim in the total amount of $141,573.12. (*Id.*)

On December 5, 2005 the Mahans and the Trustee entered into a settlement agreement (the "Settlement Agreement") which provided, among other things, that the Mahans, as tenants by the entireties, would purchase the bankruptcy estate's interest in the stock in Southeastern. (Trustee's Ex. 5 at ¶ 9.) It also provided that upon payment of the settlement proceeds, the trustee would (i) withdraw his motion for turnover, (ii) withdraw his objections to Debtor's claim of exemptions and (iii) deliver a bill of sale or such other documents as might be reasonably necessary to reflect the Mahans' purchase of the bankruptcy estate's interest in the assets. (*Id.* at ¶ 11.) The Settlement Agreement further provided that the parties would thereafter execute releases. (*Id.*) Notice of the compromise and of the proposed sale of assets was furnished to creditors on December 9, 2005. (Debtor's Ex. 1.) On January 13, 2006 the Court entered an order approving the compromise and sale of assets. (Debtor's Ex. 2.)

On December 19, 2005 Debtor and Southeastern entered into a Forbearance and Security Agreement, which granted Mercantile Bank a security interest in Southeastern's assets and stated, among other things:

> Southeastern and [Debtor] have requested that [Mercantile Bank] forbear from taking further action against Southeastern to collect the indebtedness evidenced by the Note and have further requested that [Mercantile Bank] provide a secured mortgage loan to [the Mahans] to enable them to settle certain claims and "repurchase" certain assets from [Debtor's] bankruptcy estate.

> (Debtor's Ex. 11, Preliminary Statement.)

*Forbearance Payments.* On or before December 5, 2005, Southeastern shall pay to [Mercantile Bank] the sum of $2,249.44, representing the accrued and unpaid interest due under the [Loan] as of November 14, 2005. Southeastern shall continue to pay all interest accruing under the [Loan] at the contract rate until the earlier of (i) the refinancing contemplated by paragraph 6 below or (ii) February 15, 2006. UNLESS THE INDEBTEDNESS SHALL BE REFINANCED IN ACCORDANCE WITH PARAGRAPH 6 BELOW, THE ENTIRE PRINCIPAL BALANCE TOGETHER WITH ALL ACCRUED INTEREST AND OTHER SUMS DUE UNDER THE [LOAN] SHALL BE IMMEDIATELY DUE AND PAYABLE BY SOUTHEASTERN WITHOUT FURTHER NOTICE OR DEMAND ON FEBRUARY 15, 2006.

(*Id.* at ¶ 4.)

*Mortgage Loan.* Provided that [Mercantile Bank] completes to its satisfaction its due diligence as to [the Mahans' homestead property] ... [Mercantile Bank] agrees to use its best efforts to make a mortgage loan of up to $450,000 to [the Mahans] solely to enable them to *satisfy the [Loan]* and to consummate their settlement of certain claims and purchase of certain assets from [Debtor's] Chapter 7 bankruptcy estate as described in that certain notice of compromise dated November ___, 2005 between [Debtor] and [the Trustee] ("Notice of Compromise").

(Id. at ¶ 6) (emphasis added).

The Mahans did not receive a loan from Mercantile Bank. On March 8, 2006 the Mahans received a commitment from United Southern Bank for two loans totaling $600,000.00 to "[r]efinance existing debt of $140,000 and provide funds to 'buy back' [Debtor's] assets from his Chapter 7 bank-

ruptcy estate." (Debtor's Ex. 8.) The loans were to be secured by the Mahans' residence. Debtor conceded that prior to the closing of the loan with United Southern Bank, the Mahans decided that rather than simply pay off the Loan with Mercantile Bank, they would acquire the Mercantile Bank Loan documents, including Claim 7, by way of assignment. The Mahans signed the mortgage with United Southern Bank on April 6, 2006. (Debtor's Ex. 6.)

On April 10, 2006, the Trustee's attorney, pursuant to a discussion with Debtor's attorney that day, delivered to Debtor's attorney to hold in escrow pending the Trustee's receipt of the settlement proceeds the notice of withdrawal of the motion for turnover, notice of withdrawal of objections to exemptions, bill of sale and release executed by the trustee (the "Release"). (Trustee's Ex. 7). On April 10, 2006, Mercantile Bank's attorney executed and delivered to Debtor's attorney to be held in escrow pending its receipt of $152,500.16 from the Mahans, an assignment of Claim 7 and an assignment of the note and other loan documents. The assignments are to the Mahans, as tenants by the entireties. (Trustee's Exs. 6, 8.) On April 10, 2006, Claimants signed the Release pursuant to the Settlement Agreement. The Release states:

[The Mahans], Huntsville Hearing Partners, Inc., Southeastern Hearing, Inc., M & M Hearing, Inc., Mahan, Mahan & Mahan Investments, Inc. and Troy and Pam Hearing, LLC (the "Releasors"), hereby release [the Trustee], as Trustee of the Chapter 7 bankruptcy estate of [Debtor], pending in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division; Case No. 3:05–bk–03762–JAF (the "Bankruptcy Estate") and the Bankruptcy Estate (the "Releasees") from any and all claims which the Releasors

have knowledge of against the Releasees.

(Trustee's Ex. 10.)

Debtor testified that when the Mahans signed the Release, they were aware of the escrow of the assignment of Claim 7 and of the note and other Loan documents. Debtor also testified that at the time the Mahans signed the Release, they knew that once Southeastern's debt to Mercantile Bank was paid, Mercantile Bank would assign Claim 7 to the Mahans as tenants by the entireties.

The Mahans' loan with United Savings Bank closed on the morning of April 11, 2006. (Debtor's Ex. 3.) During the afternoon of April 11, 2006 Debtor's attorney received an Outgoing Funds Transfer Advice serving as notification that the $152,560.16 was sent to Mercantile Bank. (Trustee's Ex. 11.) Later that afternoon Debtor's attorney sent an e-mail to the Trustee's attorney indicating that "[w]e funded and closed. The check and documents are on their way to you." (Trustee's Ex. 12.) The Release was delivered to the Trustee's attorney on the morning of April 12, 2006.

On April 25, 2006, this Court entered a judgment in the adversary proceeding filed by Mr. and Mrs. Cross against Debtor excepting the debt owed by Debtor to Mr. and Mrs. Cross from Debtor's discharge. (Trustee's Ex. 14.)

On May 2, 2006, Debtor's attorney filed with the Bankruptcy Court a Notice of Assignment of Claim 7 to the Mahans, as tenants by the entireties. (Trustee's Ex. 6.)

Debtor gave conflicting testimony at the hearing as to the reason for the assignment of Claim 7. On direct examination by the Trustee's attorney, Debtor testified that it was his understanding that the money the Mahans transferred to Mercan-

tile Bank satisfied Southeastern's debt to Mercantile Bank. On cross-examination by Debtor's attorney, Debtor testified that the debt formerly owed by Southeastern to Mercantile Bank is now carried on Southeastern's books as a debt owed to the Mahans. When asked why the Mahans took an assignment of Claim 7, Debtor initially testified that a primary reason was because of tax implications. Debtor then admitted that another reason was so the Mahans could receive a distribution from the bankruptcy estate.

***Conclusions of Law***

***When the Mahans executed the Release, they released the bankruptcy estate from Claim 7***

▪ The Trustee asserts that the Mahans released the bankruptcy estate from Claim 7 when they executed the Release. Debtor argues that at the time the Release was signed, the Mahans did not own Claim 7 and therefore could not have been deemed to release it. Settlements are construed according to state law. *In re Almengual,* 301 B.R. 902, 906 (Bankr. M.D.Fla.2003). Under Florida law, when the language of a release is clear and unambiguous, a court cannot "indulge in construction or interpretation of its plain meaning." *Hurt v. Leatherby Ins. Co.,* 380 So.2d 432, 433 (Fla.1980).

▪ In the instant case the Release clearly and unambiguously states that the Mahans released the bankruptcy estate "from any and all claims which the Releasors [including the Mahans] have knowledge of against the Releasees [including the Bankruptcy Estate]." It is undisputed that at the time they signed the Release, the Mahans had knowledge of Claim 7 and knew that it would be assigned to them. Debtor conceded that prior to the closing of the loan with United Southern Bank, the Mahans decided that rather than simply pay off the Loan with Mercantile Bank, they would acquire the Mercantile Bank Loan documents, including Claim 7, by way of assignment. Debtor testified that when the Mahans signed the Release, they were aware of the escrow of the assignment of Claim 7 and of the note and other Loan documents. Debtor also testified that at the time the Mahans signed the Release, they knew that once Southeastern's debt to Mercantile Bank was paid, Mercantile Bank would assign Claim 7 to the Mahans as tenants by the entireties. Because at the time they executed the Release, the Mahans had knowledge of Claim 7 and knew that it would be assigned to them, their execution of the Release released the bankruptcy estate from their right to assert Claim 7.

▪ Debtor's argument that the Mahans did not release Claim 7 because they did not own it when they executed the Release is unavailing. "[A] general release which is not restricted by its terms to particular claims or demands ... will ordinarily be regarded as embracing all claims or demands which had [m]atured at the time of its execution." *Sottile v. Gains Constr. Co.,* 281 So.2d 558, 561 (Fla.3d Dist.Ct.App.1973), *rev. denied,* 289 So.2d 737 (Fla.1974), *receded from on other grounds, Brown v. Brown,* 432 So.2d 704 (Fla.3d Dist.Ct.App.1983) (holding that release which barred all claims "from the beginning of the world to the day of the date of these presents" included all claims which had matured at the time of its execution); *Plumpton v. Continental Acreage Dev.,* 830 So.2d 208, 210 (Fla. 5th Dist.Ct. App.2002) (holding that "all inclusive language ... from the beginning of the world to the days present" barred all claims arising prior to release's execution); *Hold v. Manzini,* 736 So.2d 138, 141 (Fla.3d Dist. Ct.App.1999) (holding that release which barred all claims "from the beginning of

the world to the day of these presents" included claims which the [releasor] had or could have had against the [releasee] up to the date of its execution). "Conversely, a general release cannot be held to bar a claim which did not exist when it was signed." *Scheck v. Burger King Corp.*, 756 F.Supp. 543, 547 (S.D.Fla.1991) (citing *Sottile*, 281 So.2d at 561). The Court finds that the holdings of the preceding cases are predicated upon the qualifying language contained in each of the relevant releases. Because the release in the instant case contains no such qualifying language, it is not restricted to claims, which the Mahans owned prior to its execution. Accordingly, when they executed the Release, the Mahans released the bankruptcy estate from Claim 7.

***Even if the Mahans had not released the bankruptcy estate from Claim 7 by executing the Release, Claim 7 would be equitably subordinated to the other unsecured claims.***

■ Section 510(c) of the Bankruptcy Code is a codification of the longstanding judicially developed doctrine, which permits a bankruptcy court to subordinate certain bankruptcy claims to other claims, which it finds "ethically superior under the circumstances." *In re Lemco Gypsum, Inc., (Allied Eastern States Mgt. Corp. v. Miller)*, 911 F.2d 1553, 1556 (11th Cir. 1990). Section 510(c) provides as follows:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed inter-

est to all or part of another allowed interest;

11 U.S.C. § 510(c).

■ In order to equitably subordinate a claim, a court must find that: (1) the claimant engaged in some type of inequitable conduct; (2) the conduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) subordination of the claim is not inconsistent with the Bankruptcy Code. *Lemco Gypsum*, 911 F.2d at 1556.

■ The burden and sufficiency of proof required to establish inequitable conduct varies, depending upon whether the claimant is an insider. *In re N & D Props.*, 799 F.2d 726, 731 (11th Cir.1986). Where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. *Id.* Thereafter, "[an] insider-claimant can rescue its claims from subordination only by proving the good faith and fairness of its dealings with the debtor." *Lemco Gypsum*, 911 F.2d at 1557. Additionally, an insider-claimant's dealings with the debtor are subject to special scrutiny and are to be examined "with a large measure of watchful care". *Id.* (quoting *In re Mobile Steel*, 563 F.2d 692, 702 (5th Cir.1977)).[1] There is no requirement that the inequitable conduct be related to the acquisition or assertion of the claim. *Mobile Steel*, 563 F.2d at 700 (citing *In re Kansas City Journal–Post Co.*, 144 F.2d 791 (8th Cir.1944)). The requisite inequitable conduct "may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in

1. If the claimant is not an insider, the trustee must prove more egregious conduct such as fraud, spoilation, or overreaching, and prove it with particularity. *N & D Props.*, 799 F.2d at 731.

the distribution of the estate." *Kansas City Journal-Post,* 144 F.2d at 804.

The Mahans are clearly insiders. The Court finds that the Trustee satisfied his initial burden of presenting material evidence of unfair conduct. Although the Mahans contend that they effected an assignment of Claim 7 for tax reasons, it is clear that they caused it to be assigned rather than satisfied because they wanted to receive back from the bankruptcy estate some of the $300,000.00 that they paid to purchase assets and settle claims. By causing the assignment, the Mahans were acting solely for their own benefit, to minimize their loss, at the expense of Debtor's other creditors. The Mahans assert that the payment to repurchase Debtor's assets and settle the claims against him without the necessity of litigation, coupled with the pledge of exempt assets to effectuate the settlement, evidences their good faith and fairness in dealing with the estate. The Court finds that the repurchase agreement was borne not out of good faith and fairness but out of necessity, because it was the only way for Debtor to preserve the lucrative income from Southeastern. Accordingly, the Court finds that the Mahans failed to satisfy their burden of proving good faith and fairness in their dealing with Debtor's estate.

The Court also finds that the assignment of Claim 7 to the Mahans would injure the estate's other creditors because it would result in a lower distribution to them. As evidenced by Debtor's attorney's August 30, 2005 letter to Mercantile Bank, the Mahans knew soon after they filed bankruptcy that they would be attempting to buy the stock in Southeastern from the bankruptcy estate because it was the only way to preserve the lucrative income stream from the profitable entity. The Mahans also knew that Mercantile Bank had accelerated the promissory note as a result of Debtor's bankruptcy and, if they bought back Southeastern's stock, they would have to in short order obtain a loan to satisfy the Mercantile Bank Loan. Debtor, a savvy businessman, certainly factored the need to satisfy the Loan into the price he was willing to pay the bankruptcy estate to buy back the Southeastern stock. Had the Mahans paid off the Loan, Claim 7 would have been satisfied in full and Mercantile Bank would have received no distribution from the bankruptcy estate. However, rather than loan the money to Southeastern to satisfy the Loan, Claimants took an assignment of the note, guaranty, and other loan documents. Thus, as a direct result of taking the assignment, the Mahans reduced the distribution to Debtor's other creditors. Moreover, if Claim 7 were allowed, the Trustee would assert an equitable subrogation claim against Southeastern for the amount distributed on Claim 7, which, if successful, would require a second distribution to creditors, increase administrative expenses, and therefore reduce the distribution to creditors. Viewed from every angle, the assignment of Claim 7 would result in a lower distribution to Debtor's other creditors.

■ Finally, the Court finds that the subordination of Claim 7 is not inconsistent with other provisions of the Bankruptcy Code. Debtor argues that the United States Supreme Court's decision in *United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) prohibits the subordination of Claim 7. In *Noland,* the bankruptcy court equitably subordinated a tax penalty claim, an administrative expense, to the claims of general unsecured creditors without finding inequitable conduct. *Id.* at 536, 116 S.Ct. 1524. The Court of Appeals for the Sixth Circuit affirmed, concluding that such tax penalty claims are susceptible to subordination by

their very nature. *Id.* at 541, 116 S.Ct. 1524. The Supreme Court reversed, finding that the bankruptcy court read § 510(c) "to provide authority not only to deal with inequitable conduct on the Government's part, but also to adjust a statutory priority of a category of claims." *Id.* at 537, 116 S.Ct. 1524. The Court stated:

> Hence, the adoption in § 510(c) of "principles of equitable subordination" permits a court to make exceptions to a general rule when justified by particular facts, cf. (citations omitted). But if the provision also authorized a court to conclude on a general, categorical level that tax penalties should not be treated as administrative expenses to be paid first, it would empower a court to modify the operation of the priority statute at the same level at which Congress operated when it made its characteristically general judgment to establish the hierarchy of claims in the first place. That is, the distinction between characteristic legislative and trial court functions would simply be swept away, and the statute would delegate legislative revision, not authorize equitable exception. We find such a reading improbable in the extreme.

*Id.* at 540–541, 116 S.Ct. 1524.

In *Reorganized CF & I Fabricators of Utah*, 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), the bankruptcy court determined that a tax claim under 26 U.S.C. § 4971(a) was an excise tax under 11 U.S.C. § 507(a)(7)(E) but, equitably subordinated such claim. *Id.* at 217, 116 S.Ct. 2106. The Court of Appeals for the Tenth Circuit affirmed holding specifically that "section 510(c)(1) does not require a finding of claimant misconduct to subordinate nonpecuniary loss tax penalty claims." *Id.* at 228, 116 S.Ct. 2106. The Supreme Court reversed stating:

> The principal is simply that categorical reordering of priorities that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under § 510(c). The order in this case was as much a violation of that principal as *Noland*'s order was.

*Id.* at 229, 116 S.Ct. 2106.

*Noland* and *Reorganized CF & I* are distinguishable from the instant case. In the instant case, the Trustee is not seeking to categorically subordinate a claim but is instead seeking to subordinate a single general unsecured claim based upon inequitable conduct resulting in injury to the other general unsecured claimants. *Noland* and *Reorganized CF & I* do not prevent courts from equitably subordinating a general unsecured claim to the other general unsecured claims on a case-by-case basis where inequitable conduct is present. *See In re Merrimac Paper Co., Inc.*, 420 F.3d 53, 62–65 (1st Cir.2005) (where bankruptcy court ruled that all claims based upon stock redemption notes must be equitably subordinated, the First Circuit reversed based upon *Noland* and *Reorganized CF & I*, but held that such cases do not bar courts from exercising their equitable discretion to decide whether to subordinate particular claims on a case by case basis based upon the equities.) The equitable subordination of Claim 7 is not inconsistent with other provisions of the Bankruptcy Code by virtue of the Supreme Court's decisions in *United States v. Noland* and *Reorganized CF & I*, or for any other reason.

### *Conclusion*

When the Mahans executed the Release pursuant to the settlement agreement with the Trustee, they released the bankruptcy estate from Claim 7. Accordingly, the Court will disallow Claim 7 on that basis. Even if the Mahans had not released the

bankruptcy estate from Claim 7, Claim 7 would be equitably subordinated to the other unsecured claims. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.