**IN RE: Tony DEROSA-GRUND, Debtor.**

**Case No. 09–33264**

United States Bankruptcy Court, S.D. Texas, Houston Division.

Signed 5/19/2017

Nelson Thomas Hensley, Attorney at Law, Johnie J. Patterson, Walker & Patterson, P.C., Houston, TX, for Debtor.

Eva Engelhart, Ross Banks May Cron and Cavin PC, Aaron James Power, Joshua Wolfshohl, Porter Hedges LLP, Houston, TX, for Trustee.

Hector Duran, Nancy Lynne Holley, U.S. Trustee, Houston, TX, for U.S. Trustee.

## MEMORANDUM OPINION ON THE TRUSTEE'S APPLICATION TO COMPROMISE

## CONTROVERSY UNDER BANKRUPTCY RULE 9019

### [Doc. No. 306]

Jeff Bohm, United States Bankruptcy Judge

### I. Brief Introduction

This case was initiated on May 7, 2009 (the "Petition Date"), and has been anything but a typical Chapter 7 proceeding. Now pending before this Court is the application (the "Application") of the Chapter 7 trustee, Eva S. Engelhart (the "Trustee"), to approve a settlement that she has negotiated with Tony DeRosa–Grund,. the debtor (the "Debtor"). New Line Productions, Inc. ("New Line"), a party-in-interest, vigorously objects to the proposed settlement. For the reasons set forth herein, this Court approves the Application. The Court does so, however, with misgivings, as it has little doubt that the Debtor, who has already made material misrepresentations under oath to this Court, will foment further frivolous litigation once the order approving the Application becomes final.

### II. Factual and Procedural Background

On September 23, 2015, the Debtor filed a motion to reopen his Chapter 7 case (the "Motion to Reopen"). [Doc. No. 92]. In the Motion to Reopen, the Debtor requested this Court to reopen his case so that he could amend his schedules to disclose an asset that he claimed to have inadvertently left off his original schedules. On October 14, 2015, New Line lodged an objection to the Motion to Reopen. [Adv. Doc. No. 94]. This Court held a multi-day hearing on December 1, 2, 3, and 7, 2015, and the Court took the matter under advisement.

On January 22, 2016, this Court issued a Memorandum Opinion (the "Opinion"). [Doc. No. 122], and an order corresponding to the Opinion (the "First Order"), [Doc. No. 123]. A true and correct copy of the Opinion and the First Order are attached hereto as **Exhibits A** and **B** and incorporated herein for all purposes. The First Order ordered that this Chapter 7 case, which was closed in 2014, be reopened so that the Trustee could administer certain previously undisclosed assets. The Opinion discusses in detail how the Debtor deliberately failed to disclose certain assets on his original schedules; and then, after he received his discharge of a substantial amount of debt, attempted to collect hundreds of thousands of dollars for these assets and, when unsuccessful, then prosecuted numerous unsuccessful lawsuits against New Line (among others) seeking to obtain judgments for huge amounts.

The Opinion describes the two key assets that the Debtor failed to disclose. One is the so-called "Treatment," and the other is an entity called Silverbird Media Group

LLC ("Silverbird"). The latter is a company owned by the Debtor as of the Petition Date. The former is an abridged script for what subsequently became the screenplay for a blockbuster movie entitled "The Conjuring." This movie generated revenues of over $300 million in 2013, and a sequel has since been made.

The Opinion also explains why the Court reopened the Debtor's case and the conditions that the Court imposed in doing so. Specifically, the Court required the Debtor to schedule the Treatment and Silverbird so that the Trustee could administer these assets for the benefit of the estate—i.e., for those creditors whose allowed claims had not been paid when the case was initially closed in 2014. The Opinion also set forth that if, after the Trustee administered these previously undisclosed assets, any excess funds remained in the estate, they would **not** be distributed to the Debtor. The Court issued this particular ruling on the grounds that the Debtor's skullduggery should, as a matter of equity, bar him from receiving any distribution. The Debtor has appealed this ruling, and the Trustee is defending this holding.

To the Trustee's credit, she has been able to sell the estate's interest in the Treatment, plus take certain other actions, such that more than enough cash has been generated to pay all allowed unsecured claims and all allowed administrative claims. [Doc. No. 371]. Indeed, the holders of unsecured claims have received interest on their claims. [*Id.*]. This result is exceptional, and the Trustee deserves much credit for her efforts.

And, also to her credit, the Trustee is trying to comply with the Opinion and the First Order by not distributing any excess funds to the Debtor. Specifically, after she paid off all allowed unsecured claims, and set aside what she believes is a sufficient amount of funds to pay off all allowed administrative claims, the Trustee calculated that there are excess funds in the estate. On February 1, 2017, she filed a motion requesting this Court's approval to pay a portion of these excess monies to two charitable organizations as follows: (1) to the Ronald McDonald House of Houston, Inc., the sum of $35,000.00; and (2) to the Covenant House Texas, the sum of $35,000.00. [Doc. No. 287]. The Court approved this request in an order dated February 9, 2017 (the "Second Order"), and the Debtor timely appealed this ruling. [Doc. No. 289]. As with the Debtor's appeal of the First Order, the Trustee is defending the Second Order. Both appeals are presently pending before the Honorable Sim Lake, United States District Judge for the Southern District of Texas ("Judge Lake"). [Doc. No. 290 & 303]; [Civ. Act. No. 4:17cv591].

At a status conference before Judge Lake, the following exchange, in pertinent part, occurred among Judge Lake, counsel for the Trustee, and counsel for the Debtor:

> The Court: Is there a chance that this matter can be resolved? I mean, I hate to spend—let me just talk a second. I hate to spend money when the creditors have been paid. Of course, it benefits your law firm, that's great. I have also been skeptical of awarding money to a charity from a party. That's like forced contributions. It's just not something that, I don't think courts—who's going to decide which charity?

> Trustee's Attorney: The trustee. Judge Bohm has ordered the trustee should decide what charity they go to. I would say this about settlement. I believe that if Mr. Patterson and I in a different context had this pool of money and these issues we would settle it. In bankruptcy court, any settlement

that we would reach would have to be approved by Judge Bohm. And I am very confident, given that opinion you read and the record so far, he is not going to approve any settlement whereby I let Mr. Patterson's client walk away with any money.

The Court: Well, he might if the reference were withdrawn and I were going to approve it.

Debtor's Attorney: If that were to happen, Judge, I feel like there is probably an 80 percent chance we could resolve everything.

The Court: I am not saying I am going to do that, but I am looking at the specter of writing three long opinions and I am looking at the specter—and nothing more do I love than writing bankruptcy opinions. That's the reason I wanted to become a federal judge. But seriously, it's just if we're spending a huge amount of attorney and judge time on an issue that could be resolved, I would seriously consider any reasonable relief you could suggest.

Trustee's Attorney: I appreciate that, Your Honor.

The Court: That's all I am going to say.

. . .

Debtor's Attorney: Quite frankly, as far as settlement, we haven't. I mean, all of us work here, work together. We work in that little environment downstairs in bankruptcy court all the time. And so, this is something that can be resolved. It's not something that can be resolved and approved by Judge Bohm at this stage, quite frankly. I mean, that's just—

The Court: Well, Judge Bohm is a fine judge, but the appeal is to me. The way the courts work, sometimes the Fifth Circuit does things that I didn't

think would be a good idea, but that's the way the system works.

[Trustee's Ex. 18, 23:9–24:17, 25:2–12].

After reflecting upon Judge Lake's comments, the Trustee became concerned that she would not prevail in the appeals, and that therefore the Debtor—not the two charities—would end up receiving all of the surplus funds in this case. [Mar. 10, 2017 Tr. 4:15–24]. Accordingly, she entered into settlement discussions with the Debtor, and has negotiated a compromise that, if approved, results in the two charities still each receiving $35,000.00. [Mar. 10, 2017 Tr. 28:3—11]; [Doc. No. 306, p. 8 ¶ 33]. The terms of the proposed settlement (the "Proposed Settlement") are set forth in the Application, which the Trustee filed on February 24, 2017. [Doc. No. 306]. The material terms are as follows:

(1) The Debtor will dismiss his appeal of the First Order with prejudice;

(2) The Debtor will dismiss his appeal of the Second Order with prejudice;

(3) The Trustee will proceed to pay $35,000.00 to each of the two charitable organizations as set forth in the Second Order;

(4) Upon closing this Chapter 7 case, the Trustee will abandon the estate's interest in two entities: Silverbird and Evergreen Media Group LLC ("EMG"). The former is the entity that the Debtor did not initially disclose in his schedules, but, as required by the First Order, did subsequently disclose, representing that the value of his interest in this corporation is $0.00. The latter is an entity that the Debtor did initially disclose—representing that his interest in this corporation has a value of $1,000.00;

(5) The Trustee will disclaim any right that she has to receive any portion

of future payments relating to "The Conjuring";

(6) The Trustee will exchange mutual releases with the Debtor, Silverbird, EMG, and Evergreen Media Holdings LLC ("Holdings"). The latter entity is a corporation that has never been property of the estate, but that has been the party to litigation over the Treatment; the Debtor is the manager and the executive chairman of this entity, [Doc. No. 122, p. 6 ¶ 5].

[*Id.* at p. 8 of 15].

On March 7, 2017, New Line filed an objection to the Application. [Doc. No. 318]. New Line is a subsidiary and an affiliate of Warner Brothers Entertainment, Inc. and it is this entity, among others, that the Debtor has frequently sued to recover what he has alleged are his damages from the use of the Treatment by New Line and its affiliates. The gravamen of New Line's objection is this: Pursuant to an order of this Court on December 16, 2016 approving a compromise between New Line and the Trustee (the "New Line/Trustee Settlement"), New Line paid $200,000.00 to the Trustee for all of the estate's interest in the Treatment; the Debtor now takes the position that EMG has actually owned the Treatment since February 9, 2009;[1] the Debtor also takes the position that Silverbird has an interest in the Treatment, [*see* Doc. No. 275]; and if the Trustee abandons the estate's interests in EMG and Silverbird to the Debtor, he will use these two entities to orches-

trate further litigation against New Line seeking damages for New Line's alleged misappropriation of the Treatment. Stated differently, New Line complains that if this Court approves the Proposed Settlement, New Line will be deprived of the benefit of the bargain that it negotiated with the Trustee and will once again find itself spending attorneys' fees and time fending off frivolous lawsuits initiated by the Debtor.

On March 10, 2017, this Court held a hearing on the Application and New Line's objection thereto. Only one witness testified at this hearing: the Trustee herself. The Court finds that her testimony was very credible and the Court gives it substantial weight. Additionally, both the Trustee and New Line introduced several exhibits. The Trustee introduced Exhibits 1 through 20, and New Line introduced Exhibits A through W. After admitting exhibits, hearing testimony, and listening to closing arguments of counsel, the Court took the matter under advisement.

Then, on April 11, 2017, New Line filed an emergency motion to reopen the evidence and allow additional discovery. [Doc. No. 359]. On May 2, 2017, the Court held a hearing on this motion, and granted New Line's request in part. [Doc. No. 382]. Specifically, the Court admitted five additional exhibits from New Line, all of which were documents produced by the attorney for Silverbird, EMG, and Holdings at a hearing held on March 31, 2017. The Court admitted these additional exhibits as New Line exhibits A, B, D, E, and F, but they have since been re-lettered as New Line

---

1. One of the documents introduced by New Line (obtained through an order from this Court) purports to be a pre-petition assignment (dated February 9, 2009) of the Treatment from the Debtor to EMG. [New Line Ex. Y, p. 2]. The first page of New Line Ex. Y reflects that the Debtor allegedly discovered the existence of this assignment on November 22, 2016. Thus, the Debtor, who testified in

2015 that he, and he alone, owned the Treatment, but who assuredly became unhappy with the Opinion and the First Order when they were issued on January 22, 2016, just happened to locate a document several months later showing—Surprise, Surprise!—that he did not own the Treatment on the Petition Date after all.

exhibits X, Y, Z, AA, and BB. [Doc. No. 393, pp. 3–4 of 6]. Accordingly, this Court's ruling on the Application is based upon: (1) the record made at the March 10, 2017 hearing (the "Hearing"); (2) the five exhibits admitted during the May 2, 2017; and (3) certain testimony given at a "show cause" hearing on March 31, 2017 by David Lake, the attorney for Silverbird, EMG, and Holdings, together with a stipulation by Debtor's counsel, all of which concern the Debtor's status as the corporate representative of Silverbird, EMG, and Holdings, and his giving authorization to Mr. Lake to file pleadings in Judge Lake's court and in this Court, [see infra note 21].[2]

Pursuant to Federal Bankruptcy Rules 9014 and 7052, this Court now issues the following Findings of Fact and Conclusions of Law.[3] To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

### III. Conclusions of Law

#### A. Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

##### 1. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012–6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because its resolution affects the administration of the Debtor's bankruptcy estate. Additionally, this dispute is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). See In re Southmark Corp., 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); In re Ginther Trusts, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Here, the dispute between the Trustee and New Line is a core pro-

---

**2.** Cf. In re Acequia, Inc., 787 F.2d 1352, 1358–59 (9th Cir. 1986) (holding that a bankruptcy court is not precluded "from considering evidence presented by the parties at prior evidentiary hearings ... [and that] [t]o require the bankruptcy court to ignore prior evidence would impose a harsh and unnecessary administrative burden."); Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer), 95 B.R. 143, 146 (9th Cir. BAP 1988) (acknowledging that "a bankruptcy judge may, but need not, consider evidence from a prior hearing in the same case").

**3.** Hereinafter, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure. Further, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., § ) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

ceeding because it is governed by Rule 9019, which expressly allows the Trustee to seek approval of the compromise that she has negotiated with the Debtor (i.e., the Proposed Settlement). Stated differently, the dispute between New Line and the Trustee over the Proposed Settlement could arise only in the context of a bankruptcy case.

### 2. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1) because the Debtor resided in the Southern District of Texas for the 180 days preceding the Petition Date.

### 3. Constitutional Authority to Enter a Final Order on the Application

Approval of any compromise proposed under Rule 9019 is a final order. *In re Nutraquest, Inc.*, 434 F.3d 639, 643–44 (3d Cir. 2006) ("Because the Court's order approving the settlement agreement is a final order, we have appellate jurisdiction under 28 U.S.C. § 1291). In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any matter brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503, 131 S.Ct. 2594. As already noted above, the pending matter before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering final orders here. A core proceeding under 28 U.S.C. § 157(b)(2)(A) is entirely different than a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."). *See also In re Davis*, 538 Fed.Appx. 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, —— U.S. ——, 134 S.Ct. 1002, 187 L.Ed.2d 851 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' ... We decline to extend *Stern's* limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern's* 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) ...."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the dispute between the Trustee and New Line arises from the Trustee's request for this Court to approve the Proposed Settlement, which is governed by an express Bankruptcy Rule—namely, Rule 9019—as well as judicially-created law from federal courts as to how

this rule should be applied. Stated differently, the matter before the Court does not involve solely state law, but rather heavily involves bankruptcy law. For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order on the Application. *In re Junk*, Case No. 13-55139, 566 B.R. 897, 904 (S.D. Ohio 2017) ("For even after *Stern v. Marshall*, bankruptcy courts have the constitutional authority to enter final orders approving settlements under Rule 9019(a)....") (citations omitted).

Finally, in the alternative, this Court has the constitutional authority to enter a final order because the parties have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif,* ⸺ U.S. ⸺, 135 S.Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent ...."). Indeed, the Trustee filed the Application; New Line filed its objection thereto; this Court held a hearing on March 10, 2017; this Court held a further hearing on May 2, 2017; and at no time did the Trustee or New Line ever object to this Court's constitutional authority to enter a final order on the Application. If these circumstances do not constitute consent, nothing does.

## B. Standing of New Line to Object to the Application

At the Hearing, counsel for the Debtor asserted that New Line has no standing to object to the Proposed Settlement. [Mar. 10, 2017 Tr. 28:20–30:25]. This Court disagrees.[4] In *In re A.P.I., Inc.,* the court aptly articulated the requirements that an entity must satisfy to achieve "party in interest" status for lodging an objection:

> Over several decades of jurisprudence, the Supreme Court has formulated a two-component test to enable the federal courts to determine the standing of com-

---

4. The Court notes that at the Hearing, after counsel for the Debtor asserted that New Line had no standing to object to the Proposed Settlement, this Court ruled that the Debtor had no standing to participate at the hearing on the Application. [Mar. 10, 2017 Tr. 28:20–30:25]. Counsel for the Debtor argued that the Application seeking approval of the Proposed Settlement is a joint application and that therefore the Debtor did have standing to participate at the Hearing. [*Id.* at 6:13–23]. This Court disagreed on the grounds that Rule 9019(a) *only allows a trustee to file a motion seeking approval of a compromise.* ("On motion *by the trustee* and after notice and hearing, the court may approve a compromise or a settlement.") (emphasis added); [Mar. 10, 2017 Tr. 30:10–23]. Moreover, the Court noted that only counsel for the Trustee signed the Application, [Mar. 10, 2017 Tr. 7:1–7]; the pleading is not styled as a "joint application." Finally, the Court noted that pursuant to the applicable local bankruptcy rules, New Line had filed a written response opposing the Application as well as witness and exhibit lists, thus giving proper notice of its position. [*Id.* at 30:20—23]; [Doc. No. 320]. Additionally, the Trustee also filed witness and exhibit lists. [Doc. No. 321]. The Debtor could have filed a response supporting the Application as well as exhibit and witness lists, but did not do so. Under these circumstances, the Court held that the Debtor had no standing to participate at the hearing, [*id.* at 7:6–25; 30:10–25], because to do so would sandbag New Line; indeed, New Line's counsel objected to the Debtor's participation, [*id.* at 29:7–10]. Nevertheless, the Court believes that it should address whether New Line has standing to object to the Proposed Settlement because the Court has an independent duty to review the merits of the Application, and such a review necessarily includes whether the party opposing the Application has standing. *In re Roquemore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

plainants before them. Such parties must demonstrate both constitutional and prudential standing ... "To meet the requirement of constitutional standing, [a party] must show that it has suffered an injury in fact that is: concrete and particularized and actual or imminent; fairly traceable to the challenged action of the [opposing party]; and likely to be redressed by a favorable decision." The party must have such a *personal stake* in the outcome of the controversy as to assure ... concrete adverseness. The injury-in-fact must be palpable, though this requirement is not onerous. *The injury need not be current; even a threatened injury will suffice.* Once a party has met these constitutional requirements, its standing may yet be challenged on three "prudential" grounds ... A complainant's bid for standing may be defeated if: (a) it is asserting a third party's rights; (b) it alleges a generalized grievance rather than an injury particular to it; or (c) it asserts an injury outside the zone of interest the statute was designed to protect.

331 B.R. 828, 857–58 (Bankr._D. Minn. 2005) (second emphasis added) (internal citations and quotations omitted).

Here, New Line is threatened with an injury: if the Debtor regains his interest in Silverbird and/or EMG, he will have the opportunity to use these entities to seek to recover damages from New Line on the grounds that New Line has allegedly misappropriated the Treatment at the expense of Silverbird and/or EMG; thus, New Line will have to expend more time and attorneys' fees litigating over who owns the Treatment, thereby depriving New Line of the benefit of its bargain when it paid the Trustee $200,000.00 for the Treatment pursuant to the New Line/Trustee Settlement. These future litigation costs sufficiently constitute a "threatened injury" for New Line to be a party-in-interest with standing to object to the Application.[5]

And, any challenge to New Line's standing on "prudential" grounds fails. This is so because New Line is not asserting any third-party rights; it is asserting its own rights to the Treatment pursuant to the New Line/Trustee Settlement that it negotiated with the Trustee in late 2016. Nor is New Line asserting a generalized grievance in opposing the Proposed Settlement; rather, New Line is alleging that if this Court approves the Proposed Settlement, New Line itself will suffer a specific injury: namely, deprivation of the benefit of

**5.** This Court issued the Opinion after hearing extensive testimony in 2015 about who owned the Treatment, including definitive testimony from the Debtor himself that he—and he alone—has always owned the Treatment. [Dec. 1, 2015 Tr. 124:19–23, 153:14–154:3]. After hearing this testimony, the Court, in the Opinion, made an express finding that the Debtor owns the Treatment. Therefore, the Court wants to emphasize here and now that: (1) it does *not* believe that either EMG or Silverbird—or any other entity with which the Debtor is affiliated—owns the Treatment; and (2) any future lawsuits that the Debtor instructs be filed on behalf of EMG or Silverbird—or any other entity with which the Debtor is affiliated—seeking damages for New Line's alleged misappropriation of the

Treatment would be a frivolous lawsuit. Nevertheless, it is the very threat of such lawsuits—however frivolous they may be—and New Line's need to pay attorneys' fees to defend against any suits that are actually filed, that constitute the "threatened injury" here for purposes of analyzing whether New Line has demonstrated constitutional standing to challenge the Application. And, given the Debtor's history of filing numerous suits against New Line—the Opinion reviews in detail the four lawsuits that he filed in 2014/2015 in the Southern District of Texas alone—there is no question that there is a palpable threat that he will use Silverbird and EMG to file more suits against New Line in the future.

its bargain in that the $200,000.00 that it paid to the Trustee will have gone for naught, and that the Debtor will drag New Line into further litigation seeking damages for what the Debtor asserts is New Line's misappropriation of the Treatment. Finally, the particular injury about which New Line is concerned is not outside the zone of interest that Rule 9019 is designed to protect. Rule 9019(a) expressly requires that notice and a hearing be held whenever a trustee seeks court approval of a compromise. Here, having received and reviewed the Application, New Line has objected on the grounds that the Proposed Settlement undermines· the New Line/Trustee Settlement that this Court previously approved, the terms of which have already been fully effectuated pursuant to a final, non-appealable order.

For all of these reasons, this Court finds that New Line is a party-in-interest that has standing to object to the Application.

## C. Analysis of the Proposed Settlement Between the Trustee and the Debtor Under Rule 9019 and Applicable Case Law

 Rule 9019 authorizes bankruptcy courts to approve compromises and settlements submitted by a trustee. Ultimately, a compromise must be "fair, equitable and in the best interest of the estate." *In re Jackson Brewing Co.*, 624 F.2d 599, 605 (5th Cir. 1980).

 When considering whether a compromise is "fair, equitable and in the best interest of the estate," *id.*, the Court must weigh the "terms of the compromise with the likely rewards of litigation," *id.* at 602 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)). Courts must consider the following factors:

(1) The probabilities of ultimate success should the claim or claims be litigated;

(2) The complexity, expense, and likely duration of litigating the claims;

(3) The difficulties of collecting a judgment rendered from such litigation; and

(4) All other factors relevant to a full and fair assessment of the wisdom of the compromise.

*TMT Trailer Ferry*, 390 U.S. at 424, 88 S.Ct. 1157.

With respect to the fourth factor, the Fifth Circuit, and other courts, have elaborated on what issues this Court should consider in assessing the wisdom of the compromise:

(1) The paramount interest of creditors with proper deference to their reasonable views. *Matter of Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1996); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984).

(2) The extent to which the proposed settlement is the product of arms-length negotiations. *Matter of Cajun*, 119 F.3d at 356; *In re Foster Mortg. Corp.*, 68 F.3d at 918; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).

(3) Whether the proposed settlement is with an insider. *In re Foster Mortg. Corp.*, 68 F.3d at 919; *In re Dow Corning Corp.*, 192 B.R. 415, 422 (Bankr. E.D. Mich. 1996).

(4) Whether the proposed settlement promotes the integrity of the judicial system. *In re Kallstrom*, 298 B.R. 753, 761 (10th Cir. BAP 2003);

*In re Lakeland Dev. Corp.*, 48 B.R. 85, 90 (Bankr. D. Minn. 1985).

"The trustee bears the burden of establishing that the balance of the above factors supports a finding that the compromise is fair, equitable, and in the best interest of the estate." *In re Roqumore*, 393 B.R. at 480. *See also In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995); *In re A & C Props.*, 784 F.2d 1377, 1381 (9th Cir. 1986). "[T]he Trustee's burden is not high. The Trustee need only show that his decision falls within the range of reasonable litigation alternatives." *In re Roqumore*, 393 B.R. at 480 (internal citations omitted). The decision to approve a "compromise lies within the discretion of the trial judge." *Matter of Aweco, Inc.*, 725 F.2d 293, 297 (5th Cir. 1984). Indeed, in exercising its discretion, this Court can give more weight to one or more of the above-referenced factors than to the other factors. *In re Bard*, 49 Fed.Appx. 528, 532–33 (6th Cir. 2002) (affirming bankruptcy court's ruling even though the bankruptcy court stated that: "While the Court does consider the Debtors' interest as a legitimate factor, the Court gives it less weight than the other factors."); *In re Adelphia Commc'ns. Corp.*, 327 B.R. 143, 160–65 (Bankr. S.D.N.Y. 2005) (giving certain factors "some weight," "no weight," or "moderate weight"). The Court now addresses each of the above-referenced factors.

## 1. The Probabilities of Ultimate Success on the Claim or Claims to be Litigated

At the Hearing, the Trustee testified that based upon Judge Lake's comments, she does not believe she can prevail on the Debtor's appeal of the First Order (ordering that no surplus funds are to be distributed to the Debtor) or the Debtor's appeal of the Second Order (authorizing the Trustee to distribute a portion of the existing surplus funds, i.e., $70,000.00, to the two charities). [Mar. 10, 2017 Tr. 10:13–12:13]. Granted, Judge Lake did not definitively state that he would hold that the Trustee may not distribute the $70,000.00 to the charities; and it might well be after hearing oral argument and reviewing the entire record and the briefs filed by the parties, he would approve distribution to the charities. Or, as New Line has suggested, it might be that Judge Lake would hold that the $70,000.00 may not be paid to charity, but instead can be distributed to some third party other than the Debtor—such as the Clerk of Court.[6] [Mar. 10, 2017 Tr. 90:11–25]. Nevertheless, Judge Lake's words are fairly adamant and have caused legitimate concern for the Trustee, and this Court finds eminently reasonable her belief that she will probably lose on this issue in his court and that he will rule that the Trustee must distribute all excess funds (including the $70,000.00 presently earmarked for the charities) to the Debtor.

**6.** Such a ruling would certainly accord with the Opinion and the First Order because the Debtor would not receive a dime. This Court is not wedded to the notion that the funds have to be paid to charity. Indeed, in the Opinion, this Court stated the following: "This Court wants to emphasize to the Debtor here and now that if any excess proceeds remain after the Trustee administers the Treatment and completely pays off all claims and his own fee, then this Court will direct that these excess proceeds go *not* to the Debtor, but rather to the United States or be made available to public interest, charitable, educational, and other public service organizations." *In re DeRosa–Grund*, 544 B.R. 339, 383 (Bankr. S.D. Tex. 2016) (emphasis in original). Thus, it would be completely consistent with the Opinion and the First Order if the excess proceeds were distributed to the Clerk of Court.

Arguably, the analysis of this first factor stops right here with this Court finding that the first factor weighs in favor of approving the Proposed Settlement. Yet, an argument can be made that the analysis should also focus on what rulings might emanate from higher appellate courts. After all, the first factor is entitled the "probabilities of ultimate success" on the claim to be litigated, and the word "ultimate" suggests that the Trustee should look beyond the district court level—at least to the level of the Fifth Circuit. Here, the Trustee has done so. In the Application, she acknowledges that the Fifth Circuit, in *In re Jackson*, 574 Fed.Appx. 317 (5th Cir. 2014), seems to endorse a trustee giving excess funds to charity when the debtor has failed to disclose an asset.[7] However, the Trustee also points to language from the Fifth Circuit in *Kane v. Nat'l Union Fire Ins.*, in which the Fifth Circuit, in issuing a ruling about a debtor in Chapter 7 who failed to disclose an asset, stated the following: "Moreover, the Kanes [i.e., the debtors] stand to benefit only in the event that there is a surplus after all debts and fees have been paid." 535 F.3d 380, 387 (5th Cir. 2008). This sentence suggests that the Fifth Circuit believes that even if a debtor fails to disclose an asset, he is nevertheless entitled to distribution of any excess funds after all claims are paid in full. The language from *Kane* is admittedly incongruent with the language in *Jackson*, and therefore the Trustee has shown that she is reasonable in her belief that if this issue ends up before the Fifth Circuit, she might not prevail.

Although the Trustee gave no testimony about her concerns of losing if the issue were ever before the Supreme Court, there are three cases from the Supreme Court germane to the issue of whether a bankruptcy court can invoke its inherent powers and its equitable powers under § 105 to bar a dishonest debtor from receiving any surplus funds.[8] In *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007), the Supreme Court was confronted with the issue of whether a debtor who tries to hide assets has the unfettered right to convert his Chapter 7 case to a Chapter 13 case and retain ownership of those assets by confirming a Chapter 13 plan. While the plain language of § 706(a) permitted the debtor to convert his case to Chapter 13 without any limitations, the bankruptcy court and appellate courts construed this provision to include a bad faith exception and therefore these lower courts prohibited the debtor from converting. The Supreme Court affirmed this decision by holding that the bankruptcy court's equitable powers of § 105(a) and the inherent power of every federal court could be used to stop abusive litigation practices. *Id.* at

7. Specifically, the Fifth Circuit stated the following: "The estate can pursue the claims [the debtor] asserted, and if successful, the bankruptcy court ordered that any recovery exceeding the $40,538.00 in remaining claims would either escheat to the United States or be 'made available to public interest, charitable, educational, and other public service organizations.'" *In re Jackson*, 574 Fed.Appx. at 320.

8. Even though the Trustee did not address the probability of success at the Supreme Court level, this Court may do so *sua sponte*, as it has an independent duty to assess the Proposed Settlement. Indeed, in assessing a proposed compromise, "[t]he Court [cannot] simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber-stamp' the trustee's proposal." *In re Roquemore*, 393 B.R. at 480 (internal citations omitted). Rather, "a judge in bankruptcy must make a well-informed decision." *Matter of Cajun*, 119 F.3d at 356. Included in the process at arriving at a well-informed decision is an analysis of any applicable Supreme Court opinions.

375, 127 S.Ct. 1105. And, in applying that principle, the Supreme Court telegraphed to bankruptcy courts that they have the power to bar a dishonest debtor from converting his case from Chapter 7 to Chapter 13 despite the plain language of the statute. Application of *Marrama* to the case at bar supports the undersigned judge's invocation of § 105 and the doctrine of judicial estoppel to prevent the Debtor, who failed to disclose his ownership of the Treatment and of Silverbird, from receiving any distribution of excess proceeds in the estate.

However, in *Law v. Siegel*, the Supreme Court held that the bankruptcy court could not utilize its equitable powers under § 105(a) to allow a Chapter 7 trustee to surcharge the debtor's exempt property because of the debtor's misconduct. —— U.S. ——, 134 S.Ct. 1188, 1198, 188 L.Ed.2d 146 (2014). In fact, the Supreme Court stated that: "*Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code." *Id.* at 1197. There is no question that § 726(a)(6) expressly states that after all allowed claims are paid in full, "any excess property of the estate shall be distributed ... to the debtor." There is no language in § 726(a)(6) that expressly bars distribution of excess funds to a debtor if he has misbehaved in some respect (such as failing to disclose assets). Under the "plain meaning" rule articulated by the Supreme Court in *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Debtor here would receive all of the excess funds held by the Trustee. Thus, application of *Siegel* and *Ron Pair* to the case at bar, contrary to the application of *Marrama*,

do not support the undersigned judge's invocation of § 105 to prevent the Debtor from receiving any distribution of excess proceeds from the estate.

In sum, given Judge Lake's comments, the difficulty in reconciling the Fifth Circuit's language in *Jackson* with its language in *Kane*, and the difficulty in reconciling the Supreme Court's holdings in *Marrama* with its holdings in *Siegel* and *Ron Pair*, this Court finds that the probability of the Trustee ultimately prevailing on the Debtor's appeals of the First Order and the Second Order is less than fifty percent. Stated differently, this Court finds that there is a greater probability of failure than success with respect to the Trustee ultimately prevailing on the issues of whether the Debtor can be barred from receiving all excess proceeds of the estate and whether some of the excess proceeds can be paid to the two charities. Under these circumstances, the Court finds that this first factor weighs heavily in favor of approving the Proposed Settlement. *See In re Myers*, Case No. 11-61426, 2015 WL 5254954, at *11 (Bankr. N.D. Ohio Sept. 8, 2015) (court approved a trustee's proposed compromise where the probability of success on the merits was less than fifty percent).

### 2. The Complexity, Expense, and Likely Duration of Litigating the Claims

The Trustee testified at the Hearing that approval of the Proposed Settlement would result in the estate not having to involve itself in any further litigation—including not only the two appeals presenting pending before Judge Lake, but also the interpleader lawsuit that is presently pending in this Court [9] [Mar. 10, 2017 Tr.

---

**9.** The style of this interpleader is *New Line Productions, Inc. v. Tony DeRosa-Grund, Evergreen Media Holdings, LLC, Evergreen Media Group, LLC, Silverbird Media Group, LLC, and* *Eva S. Engelhart*, Adv. Proc. No. 16-03137. New Line filed this suit on June 14, 2016 in order to deposit the sum of $750,000.00 into the registry of the Court. [Adv. Proc. No. 16-

20:2–13]. Moreover, approval of the Proposed Settlement would mean that the Trustee would have nothing else to do but to pay the administrative claims and file her final report so that this case may be closed. Thus, approval of the Proposed Settlement would certainly mean that the estate would incur no further expense, be involved in no further litigation, and be fully administered. Such circumstances accord with § 704(a)(*l*)'s language that the Trustee shall "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." *In re Hutchinson*, 5 F.3d 750, 753–54 (4th Cir. 1993) ("[T]he duty to close the estate expeditiously is the trustee's 'main duty' and 'overriding responsibility.' ") (internal citations omitted).

Additionally, at the status conference that Judge Lake held, he stated that if the parties did not settle, he was "looking at the specter of writing three long opinions . . ." [Trustee's Ex. No. 18, p. 24, lns. 8–9]. Judge Lake's remarks are telling. It is no mean point that with respect to the Debtor's appeal of the First Order, the Debtor has designated nine issues in his "Statement of the Issues" filed pursuant to Rule 8009(a)(1)(A). [Doc. No. 155]. Not surprisingly, one of the issues is whether the undersigned judge erred in barring the Debtor from receiving any benefits from the Trustee's administration of the assets of the estate (i.e., whether the Debtor is entitled to receive any excess proceeds from sale of estate assets), but there are several other issues that the Debtor has designated that will require Judge Lake to spend substantial time analyzing and issuing rulings thereon. For example, the first issue that the Debtor has designated is whether the undersigned judge's finding that the Debtor intentionally failed to schedule the Treatment and Silverbird is erroneous. [*Id.*]. Another issue is whether the undersigned judge erred in barring the Debtor from amending his Schedule C to claim any type of exemption relating to any assets that he did not initially disclose on his original Schedule B. [*Id.*]. These issues, and the other issues designated by the Debtor, will definitely require substantial time for the parties to brief and for Judge Lake to analyze.[10] Moreover, some of the issues fall outside of the "garden variety" bankruptcy issues that are appealed—including, for example, whether the undersigned judge can bar the Debtor from ever receiving a distribution of excess proceeds. Stated differently, some of the issues are relatively complex.

Thus, not only would approval of the Proposed Settlement allow the Trustee to expeditiously finish fulfilling her duties so that this case may be closed, but it would also free up Judge Lake to handle other pressing matters pending in his court. Additionally, the Trustee does not have unlimited excess funds, and there is no question that if the appeals proceed to the

---

03137, Adv. Doc. No. 1]. This sum represented what is referred to in the complaint initiating this interpleader as the "Sequel Payment." [*Id.* at p. 2 ¶ 1]. New Line has recently filed another motion in this adversary proceeding seeking approval to deposit additional funds into the registry of the Court. [Adv. Proc. No. 16–3137, Adv. Doc. No. 23]. If this Court approves the Proposed Settlement, then the Trustee will no longer need to be a defendant in this interpleader action.

10. In order for the reader to gain an appreciation of the amount of time that Judge Lake will have to spend on the appeal of the First Order, attached hereto as **Exhibit C** is a true and correct copy of the Statement of Issues that the Debtor filed with respect to this appeal. The nine issues that the Debtor has set forth are on pages two and three of **Exhibit C**.

Fifth Circuit—which they assuredly will if the Proposed Settlement is not approved—further substantial attorneys' fees will be incurred by the estate, and there is no guarantee that the estate will have sufficient funds to pay the Trustee's law firm in full under this scenario. After all, the Trustee does not have any more assets to administer that would generate large sums of money like the Treatment did in 2016.[11]

The above-referenced circumstances, taken together, weigh heavily in favor of approval of the Proposed Settlement. *See Depoister v. Mary M. Holloway Found.,* 36 F.3d 582, 587–88 (7th Cir. 1994) (discussing the bankruptcy court's analysis of the "complexity, expense, and likely duration of litigation" factor and holding that the bankruptcy court did not abuse its discretion in approving the proposed compromise by finding that this factor provided the "most compelling argument for approving the compromise").

### 3. The Difficulty of Collecting a Judgment Rendered From Such Litigation

Here, the Trustee is not attempting to collect a judgment against the Debtor. Rather, she is attempting to ensure that the First Order and the Second Order are affirmed—thus ensuring that the Debtor

does not receive any of the $70,000.00 or, for that matter, any other excess funds in the estate. Thus, this third factor is inapplicable for the analysis of approving or denying the Proposed Settlement.

### 4. All Other Factors Bearing on the Wisdom of the Compromise

As noted above, this fourth category encompasses four separate factors. This Court now addresses each in turn.

#### a. The paramount interest of creditors with proper deference to their reasonable views

At first blush, this factor appears to be inapplicable, as no creditors filed any responses to the Application. Indeed, no unsecured creditors have voiced any opinion—one way or the other—because they have now all been paid in full. [*See* Doc. Nos. 232, 371, & 306, p. 5 ¶ 20]. Moreover, no administrative claimants have expressed their views because they know that they their claims will be paid in full due to the substantial amount of funds still held by the Trustee. [*See* Doc. No. 371]. Only New Line has filed a response, but New Line is not a creditor in this case, as it has not filed a proof of claim or any application seeking to establish an administrative claim.[12]

---

**11.** New Line has offered to pay the Trustee the sums of $9,000.00 and $10,000.00 for the estate's interest in Silverbird and EMG, respectively. [New Line Exs. 1 & J]. The sum of $19,000.00 is a *de minimis* amount compared to the $200,000.00 that New Line paid for the estate's interest in the Treatment, and the $19,000.00 will assuredly not go a long way in helping the Trustee pay her attorneys' fees if she finds herself dealing with the two appeals before the Fifth Circuit, and perhaps the Supreme Court thereafter.

**12.** From time to time, at hearings in this Court, New Line's counsel has stated that New Line is a creditor because it has a claim against the estate for reimbursement of its attorneys' fees associated with showing this

Court the skullduggery that the Debtor has committed. [*See, e.g.,* Mar. 10, 2017 Tr. 29:24–30:7]. There is no doubt that New Line's efforts have exposed the Debtor's lies and deception to this Court. Indeed, it was New Line who opposed the Motion to Reopen this case; and while New Line did not prevail in convincing this Court to deny the Debtor's motion, it did introduce the testimony and exhibits at that hearing to convince this Court to invoke the doctrine of judicial estoppel and its § 105 powers to issue an order that the Debtor could not benefit from the Trustee's administration of any assets that the Debtor failed to disclose (i.e., the Treatment and Silverbird) and also could not amend his Schedule C to exempt any proceeds from the Trustee's administration of these assets. And, since this

■ However, New Line is a party-in-interest, and case law is clear that in assessing whether to approve a proposed compromise, a bankruptcy court should consider not only the paramount interest of the creditors, but also "whether other parties in interest support the settlement." *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 187 (Bankr. S.D.N.Y. 2016). Thus, the "paramount interest" factor does come into play in this case and this Court now considers New Line's position that the Proposed Settlement should be denied.

New Line's arguments opposing the Proposed Settlement have some merit—although not to the extent that New Line contends. First, it points out that it paid the Trustee the sum of $200,000.00 in exchange for the Trustee's conveyance to New Line of the estate's interest in the Treatment. Now, if this Court approves the Proposed Settlement, the Debtor will unquestionably own and be in control of EMG and Silverbird. Then, according to New Line, the Debtor will invariably take the position that these two entities, or one of them, own the Treatment, which, in turn, will lead the Debtor, on their behalf, to initiate one of more lawsuits against

New Line seeking damages for its alleged misappropriation of the Treatment. Indeed, New Line emphasizes that the Debtor has, in recent months, taken the position that there is more than one version of the Treatment, and he is now contending that EMG owns a different version of the Treatment—thereby setting the stage for more lawsuits to be orchestrated by the Debtor. [*See* Mar. 10, 2017 Tr. 15:1–9, 53:20–54:21]. New Line rightfully suspects that it will find itself expending more time and attorneys' fees defending against these claims, thereby depriving New Line of the benefit of the bargain that it negotiated in 2016 with the Trustee when it paid $200,000.00 for the estate's interest in the Treatment. New Line's point is particularly well taken given that: (1) the Debtor emphatically testified in this Court in 2015 that he—and he alone—owned the Treatment prior to his bankruptcy filing, [New Line Ex. M, p. 50]; and (2) the Debtor filed numerous lawsuits in the United State District Court for the Southern District of Texas alleging that he personally owned the Treatment, [*id.* at p. 56]. Under these circumstances, New Line's assertion that this Court should not approve the Proposed Settlement—thus giving the Debtor the opportunity to use EMG and Silverbird as vehicles for filing more suits

Court has reopened the case, New Line has introduced evidence further demonstrating that the Debtor continues to play fast and loose with the judicial process. Nevertheless, this Court fails to see at this time how New Line has a claim against the estate. It has never filed a proof of claim for any prepetition amounts owed to it by the Debtor, nor has it filed any application seeking to establish an administrative claim. Indeed, there does not appear to be a statutory vehicle for New Line to obtain an administrative claim. Section 503(b)(3) provides an avenue for obtaining an administrative claim by making a "substantial contribution" to a case, but this section only applies to Chapter 9 cases and Chapter 11 cases, and only a "creditor" has standing to file such an application. *See*

*In re Hackney*, 351 B.R. 179, 201 (Bankr. N.D. Ala. 2006) ("Congress knew how to create a 'substantial contribution' administrative expense for cases it believed were appropriate for that benefit. It did that in section 503(b)(3)(D) for Chapter 9 and Chapter 11 cases. It could have done the same in Chapter 7 cases. It did not."). The case at bar is a Chapter 7 case, and New Line is simply not a creditor; hence, although this Court believes that New Line has made a substantial contribution insofar as it has exposed the Debtor's pernicious and persistent perfidy throughout his case, the Court does not see how it can award an administrative claim to New Line. Therefore, this Court disagrees with New Line's position that it is a creditor in this case.

over the Treatment—is a reasonable position, and the Court finds merit to this argument.[13]

The Court finds less merit in New Line's second point. New Line asserts that as part of the New Line/Trustee Settlement, not only did New Line pay $200,000.00 for the estate's interest in the Treatment, it also paid for the Trustee's release, on behalf of the estate, of "any and all claims or causes of action the estate may possess against New Line." [Doc. No. 263, p. 1 ¶ 2]. New Line's position is that this release includes any claims that Silverbird and EMG might have against New Line. New Line contends that because the estate owns Silverbird and EMG, it follows that the Trustee owns any claims held by these entities and therefore had the power and authority to release these claims and, in fact, did so as part of the New Line/Trustee Settlement in 2016. So, New Line asserts that this Court should not approve the Proposed Settlement because to do so would give the Debtor the opportunity to use EMG and Silverbird as vehicles for filing claims over the Treatment when these claims—to the extent that they have ever existed—have already been released.[14]

The weakness in New Line's argument is that it is by no means clear that the Trustee released any claims held by Silverbird and EMG as part of the New Line/Trustee Settlement for which New Line paid $200,000.00 to the estate. This is so for two reasons.

First, case law suggests that the release actually given by the Trustee does not encompass any claims held by either Silverbird or EMG. It is black-letter law that settlements are construed according to state law, *In re Mahan*, 373 B.R. 177, 182 (Bankr. M.D. Fla. 2007); therefore, this Court applies Texas law. The Texas Supreme Court has held that "general categorical release clauses are narrowly construed." *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984); *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 885 (Tex. App.—Dallas 2014). The release that the Trustee gave to New Line, which is set forth solely in this Court's order of December 16, 2016 approving the New Line/Trustee Settlement, reads as follows: "Immediately and automatically upon receipt of the Settlement Payment [i.e., the $200,000.00], the Trustee, on behalf of the Debtor's estate, releases and discharges any and all claims or causes of actions the estate may possess against New Line." [Doc. No. 263, p. 1 ¶ 2].

There is no question that this language constitutes a general categorical release and therefore must be narrowly construed. A reasonable argument exists that a narrow construction of the Trustee's release precludes any claims not held by the estate directly—i.e., this release encompasses claims held by the Debtor himself as of the Petition Date, but not claims held by the

---

**13.** The Court subsequently discusses herein its finding that the Debtor, not the Trustee, already owns EMG; therefore, to the extent that New Line is arguing that approval of the Proposed Settlement would effectively result in the Trustee conveying the estate's interest in EMG to the Debtor, New Line is incorrect. However, New Line is correct in asserting that approval of the Proposed Settlement would effectively result in the Trustee conveying the estate's interest in Silverbird to the

Debtor, and this is why the Court finds merit to New Line's argument that the Debtor, once he regains his interest in Silverbird, will use Silverbird as a vehicle for suing New Line for allegedly misappropriating the Treatment.

**14.** The Court wants to emphasize once again that it believes that no such claims exist. *See supra* note 5.

corporations owned by the Debtor on the Petition Date. Granted, a plausible argument exists that because the Trustee owns the membership interests of any entities owned by the Debtor as of the Petition Date, she had the authority in 2016 to release any claims held by these entities. *See In re Am. Housing Found.,* 518 B.R. 386, 391 (Bankr. N.D. Tex. 2014) (holding that the release that was actually executed did not release the asserted claims because the release was not signed by the person who had the authority to do so). Nevertheless, the "narrow construction" rule is long established in Texas, and therefore it is quite possible that the Trustee's release of New Line did not encompass any claims held by Silverbird and EMG. This possibility undermines New Line's argument that approval of the Proposed Settlement would allow the Debtor, using Silverbird and/or EMG, to bring claims that the Trustee has already released.

There is a second point that calls into question the strength of New Line's argument. It is highly questionable that the Trustee had the power to release any claims of EMG for a very simple reason: she did not own any interest in EMG when the Trustee's release became effective in December of 2016. Rather, the estate's interest in EMG revested in the Debtor when this Court initially closed this case on May 8, 2014. This is so because the initial trustee (David Askanase) never administered the estate's interest in EMG prior to the entry of the order closing the case, and therefore the Debtor automatically reacquired his interest in EMG by operation of law pursuant to § 554(c). The Court discusses this section in greater detail below. [*See infra* Part III.C.4.d].

In sum, New Line has one—but only one—meritorious argument that it will be harmed if this Court approves the Proposed Settlement; namely, that the approval will generate more lawsuits orchestrated by the Debtor. Because only New Line filed a response opposing the Proposed Settlement, and because it has at least one meritorious argument as to why this Court should not approve the Proposed Settlement, the Court finds that the "paramount interests" factor weighs against approval. While the Court finds that this factor disfavors approval, the Court does not give as much weight to this factor as the weight that the Court gives to the two factors already discussed above that favor approval of the Proposed Settlement. This is because, as discussed below, the Court believes that New Line will be able to prevail relatively quickly in any lawsuits filed by Silverbird and/or EMG (orchestrated by the Debtor) in the future. Stated differently, this Court believes that the ultimate harm to New Line from having to deal with frivolous suits from the Debtor in the future will probably be *de minimis.*

### b. The extent to which the proposed settlement is the product of arms-length negotiations

Based upon the credible testimony that the Trustee gave at the hearing, this Court has no doubt that the Trustee, through her attorney, negotiated at arms-length with the Debtor, through his attorney. This factor therefore weighs in favor of approval of the Proposed Settlement. *In re Charter Commc'ns,* 419 B.R. 221, 260 (Bankr. S.D.N.Y. 2009); *In re Enron Corp.,* Case No. 01–16034 (AJG), 2004 Bankr. LEXIS 2549, at *80 (Bankr. S.D.N.Y. July 15, 2004) (confirming plan and finding good faith requirement satisfied in part because plan resulted from "extensive arm's-length discussions").

### c. Whether the proposed settlement is with an insider

There is no question that the Debtor is an "insider." Therefore, because the Pro-

posed Settlement is with an insider, this factor weighs against approval of the agreement. *See In re HyLoft, Inc.,* 451 B.R. 104, 113 (Bankr. D. Nev. 2011) (denying the trustee's proposed settlement after reviewing several factors and noting that the "parties to the Proposed Settlement Agreement, excluding the Trustee, are insiders of the Debtor").

### d. Whether the proposed settlement promotes the integrity of the judicial system

Whether the Proposed Settlement promotes the integrity of the judicial system requires more than passing discussion. In one significant sense, it does. By approving the Proposed Settlement, the Debtor will receive no excess funds held by the Trustee and, moreover, $70,000.00 that would normally be distributed to the Debtor under § 726(a)(6) will instead go to two charitable organizations. This result substantially promotes the integrity of the judicial system because it demonstrates to all future debtors and their attorneys that any debtor who fails to disclose all of his assets can suffer material adverse consequences. This is no mean point, as complete disclosure is a crucial requirement for the proper functioning of the bankruptcy system. *In re Coastal Plains, Inc.,* 179 F.3d 197, 207–08 (5th Cir. 1999) ("It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims. The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action.") (internal quotation marks, emphasis, and citations omitted); *see United States v. Beard,* 913 F.2d 193, 197 (5th Cir. 1990) (explaining that debtors have a "duty to disclose to the court the existence of assets whose immediate status in the bankruptcy is uncertain, even if that asset is ultimately determined to be outside of the bankruptcy estate").

Conversely, by approving the Proposed Settlement, this Court will unquestionably be allowing the Debtor to regain all of his interest in an asset that he failed to disclose (i.e., Silverbird)—an outcome that, at first blush, is inconsistent with the First Order. This is so because the First Order sets forth that "the Debtor is barred from receiving any benefits, monetary or otherwise, from the Chapter 7 trustee's administration of the Treatment or any other asset that the Debtor did not disclose." [Doc. No. 123, p. 2]. However, if this Court approves the Proposed Settlement, it does not necessarily follow that the Debtor will receive any benefits in the future, monetary or otherwise, through regaining his ownership interest in Silverbird. This is so because after this Court issued the First Order requiring the Debtor to schedule undisclosed assets, he proceeded to schedule this interest in Silverbird, and he represented that the value of this interest is $0.00. He made this representation under oath, and case law is clear that he is bound by this representation. *Sovran Bank, N.A. v. Anderson,* 743 F.2d 223, 225 n.1 (4th Cir. 1984) ("Thus, the Schedules have not been corrected and are binding on [the Debtor]."); *In re Keen,* No. 13-71705, 2014 WL 6871867, at *6 n.6 (Bankr. W.D. Va. Dec. 3, 2014) ("This is troubling, in that it is well established that statements contained in the schedules of a bankruptcy debtor can constitute binding admissions of the factual matters set forth in such schedules, especially when they have not been amended.").

Hence, after regaining his interest in Silverbird, if the Debtor authorizes the filing of a lawsuit in Silverbird's name seeking damages for New Line's alleged misappropriation of the Treatment, the Debtor will have to explain just exactly

how he can reconcile stating under oath that Silverbird is worth nothing but nevertheless has a claim for damages for several hundred thousand dollars.[15] He might also have to explain why he asserted the Fifth Amendment when he represented in his amended Schedule B that Silverbird has no value. [New Line Ex. E, which is the Debtor's amended Schedule B filed on May 13, 2016 (Doc. No. 199) ]. He will also have to explain how Silverbird is entitled to any damages for New Line's alleged use of the Treatment when he has already testified that he—and he alone—has always owned the Treatment. [*See* Dec. 1, 2015 Tr. 124:19–23, 153:14–154:3]. This, he will be unable to do as a matter of law, and the suit should be dismissed as a frivolous filing. Stated differently, the suit should be dismissed because the Debtor scheduled his interest in Silverbird to have no value and testified that he personally owned the Treatment, and he will be bound by what he has represented under oath in his schedules and in open court. *See, e.g., Cannon–Stokes v. Potter,* 453 F.3d 446, 449 (7th Cir. 2006) ("[A] debtor in bankruptcy is bound by her own representations, no matter why they were made "). *See also In re Miller,* 403 B.R. 804, 810 (Bankr. W.D. Mo. 2009) ("Statements and representations made by a debtor in his schedules have the force and effect of oaths under § 727(a)(4)."). Thus, the probability is very low that the Debtor will be able to benefit from reacquiring his ownership interest in Silverbird. Therefore, New Line's argu-

ment that approval of the Proposed Settlement will undermine the integrity of the Opinion and the First Order is not as compelling as New Line would have this Court believe.

New Line's argument regarding EMG is even weaker. This is so because unlike Silverbird, the Debtor did in fact originally schedule his ownership interest in EMG, and he valued his interest at $1,000.00. [Mar. 10, 2017 Tr. 22:7–16]. Hence, the initial trustee (David Askanase) and the Debtor's creditors were fully aware of EMG's existence.[16] The initial trustee did not, however, administer this asset, and it was therefore simply part of the estate at the time this case was initially closed on May 8, 2014. [*See* Doc. No. 90, which is the order closing the case]. Under these circumstances, the Debtor reacquired his interest in EMG on May 8, 2014 pursuant to § 554(c), which reads as follows: "Unless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." Thus, as of May 8, 2014, the Debtor reacquired EMG by operation of law. Stated differently, the Debtor reacquired the estate's interest in EMG under the rule of irrevocable abandonment. *Kane,* 535 F.3d at 385 ("Property abandoned under [§ ] 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bank-

---

15. The Court cannot predict how much in damages the Debtor will have Silverbird seek to recover from New Line. Whatever the amount, it will assuredly not be *de minimis.* Indeed, the Debtor would not be willing to give up his chance to receive the excess funds from the estate unless he believes that he can use Silverbird as a vehicle for suing New Line to recover substantially more money than the amount of excess funds presently in the estate.

16. David Askanase was the initial trustee who administered the case between the Petition Date and the date that this Court initially closed the case. He retired prior to the date that this Court reopened the case, and Eva Engelhart was appointed the successor Trustee. However, upon her appointment, she assuredly reviewed the Debtor's schedules and became aware that he had initially disclosed his interest in EMG.

ruptcy petition was filed."); *In re. Brio Refining Inc.*, 86 B.R. 487, 490 (N.D. Tex. 1988) ("[o]nce the abandonment is final, the abandonment is irrevocable ....."). Therefore, New Line's position that this Court's approval of the Proposed Settlement is harmful to New Line because it would allow the Debtor to regain his interest in EMG is incorrect. The Debtor already owns this asset. Thus, with respect to EMG, New Line's argument that approving the Proposed Settlement would undermine the judicial process by contradicting the Opinion and the First Order is simply wrong.[17]

New Line's argument would only have merit if it could overcome the general rule of irrevocable abandonment embodied in § 544(c). The Fifth Circuit has stated that "limited exceptions, allowing revocation [of the abandonment. of the property in dispute], exist where the property was concealed or where the trustee lacks knowledge or sufficient means of knowledge, of its existence." *In re Killebrew*, 888 F.2d 1516, 1520 n.10 (5th Cir. 1989) (internal citations and quotations omitted). In the case at bar, the Debtor, despite representing that EMG had a value of $1,000.00 as of the Petition Date, is now taking the position that EMG obtained ownership of the Treatment prior to the Petition Date; and there is no doubt that the Debtor will orchestrate the filing of a suit by EMG and contend that the Treatment is worth hundreds of thousands of dollars—which makes his representation that EMG is worth $1,000.00 to essentially constitute a concealment of this entity's true value. Are these circumstances sufficient for this

---

**17.** At the Hearing, counsel for the Trustee informed the Court that the Debtor has told the Trustee that his position is that he verbally disclosed his interest in Silverbird to the initial trustee (i.e., David Askanase), [Mar. 10, 2017 Tr. 70:24–71:7], and that therefore, even though the Debtor did not disclose this interest in his schedules, his verbal disclosure to Mr. Askanase constitutes sufficient disclosure for purposes of abandonment. That is to say, the Debtor's position is apparently that because he made oral disclosure of Silverbird to the initial trustee, when this Court first closed the case on May 8, 2014, the Debtor's interest in Silverbird, just like the Debtor's interest in EMG, was abandoned to the Debtor. If the Debtor's position is meritorious, then New Line's argument that approval of the Proposed Settlement violates the Opinion and the First Order is incorrect.

However, the Debtor's position has no merit. First, § 554(c) sets forth that the only property that is abandoned is "property scheduled under section 521(a)(1) of this title," and § 521(a)(1) sets forth that "[t]he debtor shall—(1) file ... a schedule of assets ...." Thus, the only property that could have been abandoned to the Debtor on May 8, 2014 in the case at bar are assets that he actually scheduled in his initial Schedule B. Because he did not schedule his interest in Silverbird on his initial Schedule B, this interest was not aban-

doned to him when this Court first closed this case on May 8, 2014. Case law also supports this conclusion. *Guay v. Burack*, 677 F.3d 10, 20 (1st Cir. 2012) ("[The debtor] argues that the fact that the claims were discussed during the August 2009 meeting with the bankruptcy Trustee and creditors is proof that he did not attempt to conceal the claims. However, even if we were to accept that he attempted to disclose the existence of the claims at this meeting (and, for reasons discussed below, we do not), oral disclosure does not meet the requirements of the bankruptcy code. In *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir. 1995), we explained the importance of formally scheduling claims and the insufficiency of oral notification."); *In re Summers*, 320 B.R. 630, 643 (Bankr. E.D. Mich. 2005) ("The Debtor apparently still believes that it is enough that he answered questions in the Rule 2004 examination. Aside from the fact that this does not comply with the certification on the schedules themselves, the Debtor's reply also does not satisfy due process. There are other parties in interest to a bankruptcy case other than the trustee. A verbal response to one-on-one questioning by a trustee during a Rule 2004 examination is not the same as service of amendments on all entities affected ....").

Court to invoke the exception to the general rule of irrevocable abandonment and hold that when it reopened the case in January of 2016, the abandonment of EMG's interest to the Debtor that occurred on May 8, 2014 was revoked—thereby reinstating the estate's interest in EMG? If they are, then New Line's argument that the Proposed Settlement should not be approved is a legally viable argument.[18]

However, this Court concludes that the facts in the case at bar do not allow for this Court to invoke the exception to the rule of irrevocable abandonment. This is so because of the Fifth Circuit's language in *Killebrew*:

> The notion of easily revocable abandonment is not in accord with case law on abandonment. *See, e.g., In re Hunter*, 76 B.R. 117, 118 (Bankr. S.D. Ohio 1987) ("The general rule in this area is well settled-once a trustee abandons property, the abandonment is irrevocable."); *In re Enriquez*, 22 B.R. [934,] 935–36 [ (Bankr. D. Neb. 1982) ] (abandonment held irrevocable, even when property is subsequently found to have greater value than previously believed); *In re Sutton*, 10 B.R. 737, 739–40 (Bankr. E.D. Va. 1981); (abandonment irrevocable, irrespective of later discovery that property had greater value than originally realized).

*Id.* at 1520. The Fifth Circuit has telegraphed that the exception to the general rule is very narrow and that even if the

abandoned property is found to have greater value than previously believed, such circumstances still do not justify revoking the abandonment. Thus, even if EMG's value is not the $1,000.00 value that the Debtor originally scheduled it to have but rather is valued at hundreds of thousands of dollars due to EMG's alleged ownership of the Treatment, nevertheless the estate's interest in EMG is not reinstated. The Debtor reacquired his interest in EMG on May 8, 2014—when this case was initially closed—and he has owned this entity ever since. Thus, New Line's argument that approval of the Proposed Settlement contradicts the Opinion and the First Order because the Debtor will reacquire EMG simply fails as a matter of law. Therefore, with respect to EMG, approval of the Proposed Settlement does not undermine the judicial process, as New Line would have this Court believe.

Even if reopening the case on January 22, 2016 did result in revocable abandonment of EMG—i.e., even if the estate did reacquire the interest in EMG—New Line's argument that the Trustee's proposed abandonment to the Debtor of this interest deprives New Line of the benefit of its bargain in the New Line/Trustee Agreement still does not carry the day. New Line's argument is that if the Debtor reacquires EMG, he will then authorize EMG to sue New Line for damages on the grounds that EMG all along has owned the Treatment and has suffered damages through New Line's alleged misappropriation of the Treatment. Yet, assuming that

---

**18.** The Court wants to emphasize once again that merely because EMG might sue New Line on the grounds that EMG allegedly owns the Treatment and has been damaged by New Line's alleged misappropriation of the Treatment does not mean that this Court believes that EMG will have a meritorious lawsuit. Just the contrary: this Court believes that such a lawsuit would be frivolous, as the Debtor has already testified that he—and he

alone—has always owned the Treatment. *See supra* note 1. The Debtor's alleged discovery of a written document showing that he made a pre-petition assignment of the Treatment to EMG is of no avail. Indeed, at the hearing on the Motion to Reopen, the Debtor expressly testified that he had not transferred the Treatment to any third party. [Dec. 1, 2015 Tr. 52:11–21].

the Debtor does take such action—and this Court shares New Line's belief that he will—New Line has such strong defenses that it should be able to both prevail and obtain sanctions, including attorneys' fees, against the Debtor and any attorney who represents EMG in filing and prosecuting such a suit.[19] This is so because of the doctrines of collateral estoppel and judicial estoppel.

 The doctrine of collateral estoppel concerns issue preclusion and prevents a party from litigating an issue that has already been litigated. The requirements for issue preclusion, as recognized by the Fifth Circuit, are as follows: "(1) the parties must be identical; (2) the issue to be precluded must be identical to that involved in the prior action; (3) the issue must have been actually litigated; and (4) the determination of the issue in the prior action must have been necessary to the resulting judgment." *In re Keaty*, 397 F.3d 264, 270–71 (5th Cir. 2005).

 When the Debtor sought to reopen this case in 2015, he took the position in his Motion to Reopen that he—and he alone—owned the Treatment as of the Petition Date, and had simply inadvertently failed to disclose it in his initial schedules, [Dec. 1, 2015 Tr. 63:1–15, 124:19–23, 153:14–154:3]; and he based his request for this Court to reopen the case exclusively on the grounds that he owned the Treatment on the Petition Date and therefore it was property of the estate that the Trustee needed to administer, [Doc. No. 92, p. 2 ¶¶ 5–11]. New Line opposed the Motion to Reopen on the grounds that it, not the

Debtor, owned the Treatment.[20] [Doc. No. 94, pp. 6–7 ¶ 25]. This Court held a hearing on the Motion to Reopen and the Debtor testified definitively that he owned the Treatment. [Dec. 1, 2015 Tr. 124:19–23, 153:14–154:3]. New Line adduced testimony from its witness to the effect that New Line owned the Treatment. [*See* Dec. 1, 2015 Tr. 170:1–173:18]. The Court thereafter gave its ruling through its issuance of the Opinion, and expressly found that the Debtor owned the Treatment and that therefore it was property of the estate, [Opinion (Doc. No. 122, pp. 41—43 of 72) ]—which, in turn, led to this Court reopening the case so that the Trustee could administer the Treatment, [*id.* at p. 44 of 72]. And, the Trustee did so by selling the estate's interest in the Treatment to New Line in exchange for $200,000.00. [Doc. No. 263]. So, there is no doubt whatsoever that there is one—and only one—Treatment. The Debtor's position presently—namely, that EMG has actually owned the Treatment since February 9, 2009 because the Debtor conveyed it to EMG by executing an assignment to that effect—is untenable as a matter of law because of the doctrine of collateral estoppel: in 2015, the Debtor and New Line actually litigated the issue of who owned the Treatment during the hearing on the Debtor's Motion to Reopen; the issue of whether the Debtor owned the Treatment was necessary to this Court making its decision on whether to grant the Motion to Reopen; this Court found that the Debtor owned the Treatment as of the Petition Date, and therefore found that

---

19. Indeed, in the last District Court lawsuit that the Debtor filed, in the order dismissing this suit, District Judge Alfred H. Bennett found that the Debtor's litigious conduct "might suggest an abuse of the judicial process" and warned that if such behavior continued, "sanctions would likely be appropriate." *DeRosa–Grund v. Time Warner Inc.*, No.

4:15-cv-02763, 2015 WL 12806619, at *2 (S.D. Tex. Dec. 22, 2015) (Bennett, J.).

20. New Line took the position that it had previously purchased the Treatment. [Opinion (Doc. No. 122, p. 40 of 72) ]; [Dec. 2, 2015 Tr. 30:7–31:19].

the Treatment was property of the estate and that the case needed to be reopened so that the Trustee could administer the Treatment; and the Debtor cannot now relitigate this issue in an effort to prove that EMG owns the Treatment.[21]

 The Debtor's position that Silverbird and/or EMG own the Treatment is also untenable because of the doctrine of judicial estoppel. This doctrine prevents a party from asserting a position in a legal proceeding that is inconsistent with a position taken by that party in a previous proceeding. *In re Reed*, 650 F.3d 571, 573–74 (5th Cir. 2011). "In assessing whether judicial estoppel should apply, [courts] look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court accepted the prior position; (3) the party did not act inadvertently." *Id.* at 574. At the hearing in 2015 on the Motion to Reopen, the Debtor took the position that he—and he alone—owned the Treatment as of the Petition Date, and in taking this position he argued that this Court should reopen his case so that he could schedule the Treatment in order for the Trustee to administer this asset. This Court, after holding an evidentiary hearing, accepted the Debtor's position and reopened the case because this Court expressly found that the Debtor owned the Treatment as of the Petition Date and that the Treatment needed to be administered. And, there is no question that the Debtor did not act inadvertently when he took this position. He was clear and unequivocal in both the Motion to Reopen[22] and in his testimony that he, and he alone, owned the Treatment:

during the pendency of this reopened case when the Trustee has owned the membership interest in Silverbird, the Debtor, on behalf of Silverbird (as well as EMG and Holdings), has instructed an attorney, David Lake, who represents these three entities, to file pleadings on behalf of Silverbird, EMG, and Holdings, many of which have opposed relief sought by the Trustee—including the Trustee's sale of the Treatment to New Line. [Mar. 31, 2017 Tr. 11:25–15:23, 57:19–59:1, 69:14–20, 92:4–8]. Moreover, the Debtor is the managing member of Silverbird, [Opinion (Doc. No. 122, p. 7 ¶ 8)], the managing member of EMG, [New Line Ex. Y], and the manager/executive chairman of Holdings, [Mar. 31, 2017 Tr. 54:22–24]; [Opinion, (Doc. No. 122, p. 6 ¶ 5)]. If these circumstances do not constitute privity, then nothing does. Thus, EMG and Silverbird, if and when they sue New Line in the future for New Line's alleged misappropriation of the Treatment, will be unable to escape New Line's defense of collateral estoppel.

**21.** The Court notes that while the party who will doubtless be suing New Line in the future—either EMG or Silverbird, or both—is not the same party as the Debtor himself, the doctrine of collateral estoppel will still apply. The Fifth Circuit has expressly held that there are instances where a party to the first suit (here, New Line) can use issue preclusion against a plaintiff who was not a party to the first suit (here, Silverbird and/or EMG). *Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989). Specifically, "federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit." *Id.* The Fifth Circuit has found that adequate representation exists between a party and a non-party "where a party to the original suit is so closely aligned to the non-party's interests as to be his virtual representative." *Id.* (quoting *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975)). Stated differently, "[l]iteral identity of the parties is not required as part of the res judicata and collateral estoppel analysis so long as the party against whom enforcement is sought was in privity with a party involved in the initial decision." *In re Pace*, 456 B.R. 253, 268 (Bankr. W.D. Tex. 2011). Here, there is no question that the Debtor and Silverbird, as well as the Debtor and EMG, have always been in privity with one another. Indeed, even

**22.** On September 23, 2015, the Debtor's counsel filed the Motion to Reopen, and expressly set forth that the Debtor wanted this Court to reopen this case "so that he may amend his Schedule B to disclose an addition-

Q: You always believed that you owned [the Treatment] even at the time at that you filled out the Bankruptcy Schedules, right?

A: *I would say yes, I didn't think about it, but I would say that I believed I've always owned it.*

[Dec. 1, 2015 Tr. 124:19–23] (emphasis added).

Q: Okay. So you told us that, to summarize here, you never let go of ownership of "The Conjuring" rights is what you testified, and the Perron rights and the Warren rights were transferred to my client after you filed your Bankruptcy Schedules, right? Yes or no?

A: If I can parse it out.

Q: Yes or no?

A: *I always owned "The Conjuring" treatment rights.* When you conflate "The Conjuring" rights to include everything, it can't include everything, because they're separate and discreet bun-

---

al asset that is property of his estate. The additional asset is a copyright to a motion picture treatment that was written prior to his petition date . . . ." [Doc. No. 92, p. 2 of 3].

**23.** The Debtor's testimony that he has always owned the Treatment is borne out by the documentation introduced by New Line into the record at the Hearing. Specifically, Exhibits Q, R, S, and U are all documents that, although not verbatim the same, are nevertheless so similar that that this Court finds that they each represent the very Treatment that this Court found was owned by the Debtor and that the Trustee proceeded to administer, culminating with her sale of this asset to New Line in 2016 for $200,000.00 pursuant to the New Line/Trustee Settlement. [Doc. No. 263]. The Debtor's position now that there were multiple treatments—and that EMG owns one of them—is legally untenable and, if the Debtor makes such an allegation subsequently (through use of EMG, Silverbird, or some other entity that he owns and controls), he will have initiated a frivolous lawsuit deserving of sanctions—as suggested by District Judge Bennett. *See supra* note 19.

---

·dles of rights. You [i.e., New Line] got— never got the treatment,

your client never got the treatment rights. They got the rights from the Perron family under the bankruptcy agreement, and they got the Warren's rights under the Option Quitclaim Agreement, and that's the correct statement.

[*Id.* at 153:14–154:3] (emphasis added).[23]

▮ Thus, after this Court approves the Proposed Settlement, if the Debtor uses EMG to sue New Line on the grounds that EMG owns the Treatment and that New Line has misappropriated the Treatment to EMG's detriment, New Line can rely upon not only the collateral estoppel doctrine but also the doctrine of judicial estoppel to prevail in this suit and, additionally, to obtain sanctions against the Debtor and his chosen attorney (including attorneys' fees).[24] New Line's chances of doing so are extremely good

---

**24.** As with the doctrine of collateral estoppel, those in privity with a prior order are also barred by the doctrine of judicial estoppel in a subsequent action. *Feuerbacher v. Wells Fargo Bank*, No. 4:15-CV-59, 2016 WL 3669744, at *9 n.2 (E.D. Tex. July 11, 2016), *appeal docketed*, No. 16–41343 (5th Cir. Sept. 27, 2016). Indeed, some circuits, including the Fifth Circuit, "have held that privity, though often present in judicial estoppel cases, is not required." *Austin v. McNamara*, No. 6:05-CV-247, 2007 WL 5787498, at *3 (E.D. Tex. Mar. 30, 2007) (citations omitted); *In re Coastal Plains, Inc.*, 179 F.3d at 205 n.3. *See also Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 n.6 (8th Cir. 1987) (judicial estoppel does not require reliance or prejudice because it seeks to protect the courts). Thus, EMG and Silverbird, if and when they sue New Line in the future for New Line's alleged misappropriation of the Treatment, will be unable to escape New Line's defense of judicial estoppel.

based upon the judicially-created law governing sanctions (including, for example, the Supreme Court's holding in *Chambers v. NASCO*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), that federal courts have the inherent power to police the conduct of the litigants and attorneys who appear in court). Rule 9011, Federal Rule 11, and District Judge Bennett's admonishment that if the Debtor continues his litigious conduct, then "sanctions would likely be appropriate." *DeRosa–Grund*, 2015 WL 12806619, at *2.

Granted, if the Debtor takes this course of action, New Line will initially have to spend time and money defending against the suit, but given this Court's belief that New Line will easily prevail and also recover its attorneys' fees and costs, this Court finds that, on balance, approving the Proposed Settlement serves to promote judicial integrity because one of its terms is that the Debtor receives none of the excess funds held by the Trustee—and the overriding objective of this Court in issuing the Opinion, the First Order, and the Second Order has been to prevent the Debtor from recovering any excess cash from the estate.

Finally, this Court addresses New Line's argument that the First Order and the Opinion imposed a permanent bar against any asset that the Debtor failed to initially disclose from being abandoned such that the Debtor is able to reacquire his interest in the asset. In fact, the First Order reads as follows: "None of the assets that the Debtor failed to initially disclose (but which he is now required to disclose in his amended Schedule B) may be abandoned *without an order from this Court.*" [Doc. No. 123, p. 3] (emphasis added). This language shows that this Court left open the door that initially undisclosed assets could be abandoned but only if this Court signed an order approving such abandonment. Here, the Trustee has come to this Court and requested as part of the Proposed Settlement that this Court approve abandonment of the estate's interest in Silverbird—which is the one asset remaining in the estate that the Debtor failed to initially disclose. By approving the Proposed Settlement, this Court is not contradicting the First Order or, stated differently, undermining the integrity of the judicial system. The First Order's language expressly leaves open the possibility that abandonment of any undisclosed asset—such as Silverbird—could take place. Here, the Court is willing to approve the Trustee's abandonment of Silverbird— thereby allowing the Debtor to regain his interest in this entity—because in giving such approval, the Debtor is giving up any claim he has to excess proceeds held by the Trustee; and one overriding objective of this Court in issuing the Opinion, the First Order, and the Second Order was to prevent the Debtor from obtaining any excess proceeds held by the estate.

## IV. Conclusion

Pursuant to the case law that governs the evaluation of a proposed compromise, this Court has analyzed seven factors. One of the factors—the difficulties of collecting a judgment—is inapplicable in this case. Another factor—the paramount interest of creditors and parties-in-interest with proper deference to their reasonable views— weighs against approval. A third factor— whether the proposed settlement is with an insider—also weighs against approval. The other four factors weigh in favor of approval. An analysis of three of these factors reflects that: (1) the Trustee negotiated with the Debtor at arm's length; (2) that there is more than a fifty percent

probability that the Trustee will ultimately lose on the issue of whether the Debtor can be completely barred from receiving excess proceeds; and (3) if the appeals go forward, they will involve certain issues that are complex, will require extensive briefing that will substantially increase attorneys' fees, and will require an abundance of time and effort from Judge Lake to issue rulings. Finally, an analysis of the last factor—whether the Proposed Settlement promotes the integrity of the judicial system—weighs in favor of approval because under the terms of the Proposed Settlement, the Debtor will receive none of the excess proceeds. This is a result that, more than any other aspect of this dispute, achieves justice because it prevents the Debtor—who has repeatedly lied under oath and cheated the bankruptcy system— from receiving an immediate and substantial distribution of cash. All in all, four factors favor approval of the Proposed Settlement; two factors weigh against approval; and one factor is inapplicable. Of all of these factors, the Court places particularly significant weight on the last factor (promoting the integrity of the judicial system) and the "probability of ultimate success" factor—both of which weigh in favor of approving the Proposed Settlement. *See In re Adelphia Commc'n. Corp.*, 327 B.R. at 160–65 (giving certain factors "some weight," "no weight," or "moderate weight").

Accordingly, keeping in mind that the Trustee's burden is not high in establishing that the balance of factors supports a finding that the Proposed Settlement is fair and equitable, *In re Roqumore*, 393 B.R. at 480, and also keeping in mind that this Court has discretion to give different weight to each of the factors, *In re Adelphia Commc'ns. Corp.*, 327 B.R. at 160–65, the Court finds that the Trustee has met her burden of establishing that the balance of the factors weighs in favor of approving the Proposed Settlement.

This Court is acutely aware of New Line's argument that by approving the Proposed Settlement, the Debtor gains unquestionable and complete control of Silverbird, and that given the sordid history of his playing fast and loose with the truth and his willingness to sue New Line anywhere at any time, approval of the Proposed Settlement will generate more litigation between the Debtor and New Line. The Court acknowledges that its decision will give the Debtor—to use the words of New Line's own counsel—"more arrows in his quiver." [Mar. 10, 2017 Tr. 89:17]. However, as discussed herein, approval only gives the Debtor one more arrow in his quiver, as he already owns EMG and will only be regaining his interest in Silverbird as a result of this Court's approval of the Proposed Settlement. Moreover, if the Debtor, using these two entities, orchestrates more litigation against New Line, this Court believes that the probability of New Line quickly obtaining dismissals of these lawsuits, as well as obtaining sanctions against the Debtors and his surrogates (including attorneys' fees), is high. Thus, while approval of the Proposed Settlement does not insulate New Line from further attacks by the Debtor, any future attacks that he orchestrates will, as a matter of law, have no basis and should not tie up New Line in expensive and protracted litigation. To the extent that New Line is tied up in some litigation, this Court is willing to tolerate such a result in exchange for ensuring that the Debtor does not receive one red cent of the excess proceeds presently held by the Trustee.

In closing, this Court notes that in *Matter of Aweco*, the Fifth Circuit stated that:

The decision of whether to approve a particular compromise lies within the discretion of the trial judge; an appellate court will reverse only when that discretion has been abused. The exercise of judicial discretion always carries with it responsibility. The term "discretion" denotes the absence of a hard and fast rule. *When invoked as a guide to judicial action, it means a sound discretion, that is to say, a discretion exercised not arbitrarily or [willfully], but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.*

725 F.2d at 297–98 (emphasis added) (internal citations and quotations omitted).

Ultimately, this Court believes that "what is right and equitable under the circumstances and law" in the case at bar is for the Debtor to receive none of the excess proceeds associated with this case. The Court holds this belief because the Debtor has abused the judicial system and, as discussed in the Opinion, because the Debtor may have committed crimes under 18 U.S.C. that could be worthy of prosecution. Preventing him from receiving any of the excess funds by approving the Proposed Settlement is the most "fair and equitable" result in this Court's view.

An order granting the Application will be entered on the docket simultaneously herewith.